# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 16-1192V
Filed: January 11, 2020

```
* * * * * * * * * * * * *   *   *
MEGAN C. MCFADDEN,              *        To Be Published
                                *
            Petitioner,         *
v.                              *        Finding of Facts; Onset; Influenza ("Flu")
                                *        Vaccine; Shoulder Injury Related to
SECRETARY OF HEALTH             *        Vaccine Administration ("SIRVA")
AND HUMAN SERVICES,             *
                                *
            Respondent.         *
                                *
                                *
* * * * * * * * * * * * *   *   *
```

*Alexander Laufer, Esq.*, Eisenhower and Laufer, PC, Fairfax, VA, for petitioner.
*Mark Hellie, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

### RULING ON ONSET[1]

**Roth**, Special Master:

On September 23, 2016, Megan McFadden ("petitioner" or "Ms. McFadden") filed a petition pursuant to the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 *et seq*.[2] ("Vaccine Act" or "the Program"). Petitioner alleged that as a result of a quadrivalent influenza ("flu") vaccination she received on September 28, 2013 she developed a shoulder injury related to vaccine administration ("SIRVA"). Petition at 1, ECF No. 1. For the detailed reasons set forth below, I find that petitioner developed a shoulder injury related to the receipt of a flu vaccine within 24 hours of receiving her September 28, 2013 flu vaccine.

---

[1] This Ruling has been designated "to be published," which means I am directing it to be posted on the Court of Federal Claims website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). **This means the Ruling will be available to anyone with access to the internet.** However, the parties may object to the Ruling's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Ruling will be available to the public. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

# I.  PROCEDURAL HISTORY

The petition was filed on September 23, 2016, along with petitioner's affidavit and medical records. *See* Petition, Petitioner's Exhibits ("Pet. Ex.") 1-5, ECF No. 1.  This case was initially assigned to the Special Processing Unit ("SPU").  ECF No. 4.  Petitioner filed additional medical records on October 4, 2016. Pet. Ex. 6-8, ECF No. 6.

Following the initial status conference on November 9, 2016, petitioner was ordered to file her primary care records for three years prior to vaccination. Scheduling Order, ECF No. 8. Petitioner filed the additional medical records on January 9, 2017. Pet. Ex. 9-10, ECF No. 10.

Respondent filed his Rule 4(c) Report ("Resp. Rpt.") on April 10, 2017, recommending against compensation in this matter. ECF No. 15. It was respondent's position that petitioner's claim did not satisfy the criteria for an on-Table SIRVA injury. Resp. Rpt. at 6 n.7. Specifically, respondent pointed out that the contemporaneous medical records did not "document complaints of shoulder pain until a visit on March 7, 2014, nearly six months after vaccination, at which time [petitioner] stated that her pain began around November 2013 and was due to picking up her child." *Id*. at 7. Respondent noted that the history given by petitioner placed the onset of her shoulder pain "approximately two months after her vaccination." *Id*. Respondent further noted that petitioner "sought medical treatment six times between the date of her vaccination and the March 2014 visit, and there is no mention of left shoulder pain in the records of any of those visits." *Id*. Additionally, petitioner reported in March 2014 that her pain "was associated with lifting her child" and placed onset one month after a vaccination. *Id*. Respondent pointed out that petitioner did not associate her shoulder pain with a vaccination until April 4, 2014, during a phone call to Fort Belvoir; she did not mention her alleged vaccine-related shoulder pain to any of her treating doctors in Okinawa, Japan. *Id*.

Respondent also noted that petitioner was inconsistent in reporting the timing of onset. Resp. Rpt. at 8. Petitioner initially reported to Fort Belvoir that her shoulder pain started five days post-vaccination, but "when she saw Dr. Montgomery on April 30, 2014," she reported "that her left shoulder pain began 'within 24 hrs.' of her vaccination and that her pain reached a 'peak' five days later." *Id*. Additionally, respondent requested that petitioner provide "addition[al] evidence documenting the administration of the flu vaccine that is the subject of her claim." *Id*. Respondent noted that petitioner reported a different vaccination date to Fort Belvoir, and that there was no office visit documenting administration of the allegedly causal vaccine. *Id*. at 8-9.

Following the filing of respondent's Rule 4(c) Report, an Order was issued for petitioner to file additional evidence documenting vaccine administration as well as a detailed affidavit addressing the factual issues raised by respondent, including the onset of her symptoms and her lack of complaints of shoulder pain between October 2013 and March 2014. Scheduling Order at 1-2, ECF No. 16.

During a status conference on July 14, 2017, petitioner's counsel advised that he was in the process of obtaining additional medical records from the military. Scheduling Order at 1, ECF No. 19. Respondent requested that petitioner also file records of any medical care she received while in Hawaii and Seattle. *Id*. Petitioner filed a status report ("Pet. S.R.") on August 7, 2017,

advising that she was still in the process of obtaining her medical records from the military; petitioner also advised that she had not received any treatment for her alleged shoulder injury in Seattle or Hawaii. Pet. S.R. at 1, ECF No. 20. Petitioner later filed a Motion to Issue Subpoena to obtain her medical records from the military; this motion was granted. *See* ECF Nos. 26-27. The medical records were ultimately filed on December 30, 2017. Pet. Ex. 17, ECF No. 31. After reviewing the medical records, respondent filed a status report ("Resp. S.R.") on January 30, 2018, advising that he was not open to settlement negotiations. Resp. S.R. at 1, ECF No. 35.

This matter was reassigned to me on February 5, 2018. ECF Nos. 36-37.

On February 20, 2018, petitioner filed an "opinion letter" from one of her treating physicians, Dr. Montgomery. Pet. Ex. 18, ECF No. 38. His letter provided a summary of the medical record from petitioner's appointment on April 30, 2014, discussion of petitioner's MRI taken on May 2, 2014, and his reasoning for why he diagnosed petitioner with SIRVA. *See* Pet. Ex. 18 at 1-2. Dr. Montgomery wrote "based upon other etiologies having been ruled out through interview, physical and radiographic examination, the reported vaccination technique, the chronology and character of her symptoms, and her demographics, it was my opinion that Ms. McFadden's condition was most consistent with "Shoulder Injury Related to Vaccine Administration" (SIRVA)." *Id.* at 2.

A status conference was held on March 28, 2018; petitioner's counsel requested a fact hearing to resolve the issues raised by respondent. Scheduling Order at 1, ECF No. 39.

An onset hearing was initially scheduled for December 12, 2018 but had to be rescheduled when petitioner's husband was deployed to the Middle East. *See* Scheduling Order at 1, ECF No. 41; Scheduling Order at 1, ECF No. 43. The onset hearing was ultimately held on July 17, 2019, in Washington, D.C. *See* Scheduling Order at 1, ECF No. 45; Scheduling Order at 1, ECF No. 46. Petitioner and her husband testified via video conference. Scheduling Order at 1, ECF No. 54.

Following the hearing, petitioner filed a certificate of course completion for Dr. McFadden in support of his testimony. *See* Pet. Ex. 19, ECF No. 55. Petitioner filed a status report on August 6, 2019, advising that she did not intend to file a post-hearing brief. Pet. S.R., ECF No. 58.

## II.   SUMMARY OF EVIDENCE

### A.   Petitioner's Medical Record

#### a.   Petitioner's History Prior to the Flu Vaccine

Petitioner was born on February 19, 1988. Her past medical history is for the most part noncontributory. Only that which is pertinent is included herein. *See* Pet. Ex. 9 at 415; 432-539.

In 2012, petitioner suffered from migraines, esophageal reflux, cervical muscle spasms, nonallopathic lesions, irregular uterine bleeding and tachycardia. Pet. Ex. 9 at 401, 378-431. On July 17, 2012, she presented to her medical provider with complaints of muscle spasm and cervical somatic dysfunction. She underwent osteopathic manipulation and acupuncture. Pet. Ex. 9 at 401.

On September 25, 2012, petitioner presented with a chief complaint of right arm redness and pain. She was noted to have a five centimeter circumferential area of cellulitis to the right inner arm/axilla, with a small area of induration to the superior portion of the cellulitis. Pet. Ex. 9 at 388-89. She was prescribed clindamycin, Keflex, and ibuprofen. *Id*. at 389. On September 28, 2012, petitioner presented for a civilian fitness exam, was determined to be a candidate for the Ft. Polk Civilian Fitness program for six months of participation. Pet. Ex. 9 at 393.

In 2013, she became pregnant. The pregnancy was complicated by hypertension. Pet. Ex. 9 at 283, 286, 290-376; Pet. Ex. 7.

Petitioner gave birth on September 19, 2013 at 41 plus weeks while stationed in Okinawa, Japan. The baby was delivered by Caesarian section ("C-section") due to arrested descent. Pet. Ex 11 at 2. The infant was admitted to the level two neonatal intensive care unit ("NICU") for observation and monitoring due to maternal chorioamnionitis,[3] maternal fever, fetal tachycardia,[4] uterine tenderness and foul-smelling amniotic fluid. Pet. Ex. 11 at 2-3. The baby suffered persistent hypoglycemia[5] and mild thrombocytopenia.[6] Pet. Ex. 11 at 3. On October 10, 2013, at three weeks of age, the baby was sent by medevac to Tripler Army Medical Center ("TAMC") in Oahu, Hawaii for evaluation for pulmonary insufficiency/hypoxemia after he was unable to be weaned from oxygen. Pet. Ex. 11 at 10; Pet. Ex. 14 at 1. He was admitted to TAMC NICU where he was subsequently weaned from oxygen and discharged with an apnea monitor. After discharge, he had several episodes of oxygen desaturation to 89% on room air while in deep sleep. There was concern for central sleep apnea. Pet. Ex. 11 at 11. On November 15, 2013, he was admitted over night as a two-month-old to the Pediatric Sedation Center for MRI with sedation using Propofol. Pet. Ex. 11 at 11. On November 25, 2013, he was flown from Oahu, Hawaii to Seattle Children's Hospital where he was hospitalized until December 16, 2013 when he was flown back to Torii Station, Japan. Pet. Ex. 14 at 4; Pet. Ex. 13. He was ultimately diagnosed with sleep apnea, which has since resolved. Pet. Ex. 11 at 14.

### b.  Petitioner's History Following the Flu Vaccine

Following the birth of her son on September 19, 2013, petitioner received the allegedly causal flu vaccine on September 28, 2013, at the U.S. Naval Hospital in Okinawa, Japan. Ex. 1 at 1; Pet. Ex. 9 at 111; Pet. Ex. 2 at 1. Petitioner affirmed receipt of the vaccination "high and anterior on her left deltoid," after which she "experienced immediate discomfort that grew to pain within hours." Pet. Ex. 2 at 1.

---

[3] Chorioamnionitis is an infection involving the chorion, amnion, and amniotic fluid; usually the placental villi and decidua are also involved. STEDMAN'S MEDICAL DICTIONARY § 172930 (2015), Westlaw.

[4] Fetal tachycardia is a fetal heart rate of 160 or more beats per minute. STEDMAN'S MEDICAL DICTIONARY § 1895210 (2015), Westlaw.

[5] Hypoglycemia is the condition and symptoms of low blood glucose. STEDMAN'S MEDICAL DICTIONARY § 428850 (2015), Westlaw.

[6] Thrombocytopenia is the condition in which an abnormally small number of platelets is present in the circulating blood. STEDMAN'S MEDICAL DICTIONARY § 918040 (2015), Westlaw.

One month later, on October 29, 2013, petitioner telephoned her primary care manager ("PCM") requesting a punch biopsy. The purpose and location were not included in the record, but she was referred for an appointment. Pet. Ex. 9 at 277-78. The record does not document any complaint of shoulder pain.

On January 3, 2014, petitioner presented for a lesion on her upper left shoulder and biopsy of the pigmented area. Pet. Ex. 9 at 271. She also requested a referral for dermatological consult for a lump on her finger. Pet. Ex. 9 at 271-72. There was no mention of left shoulder pain. A shave biopsy was performed to the left shoulder after lidocaine with epinephrine injection was administered. Pet. Ex. 9 at 273. A pigmented nevus was removed from the petitioner's left upper shoulder. *Id.*

Petitioner presented to her PCM due to dyspareunia[7] on January 8, 2014. Pet. Ex. 9 at 267-69. There was no mention of any left shoulder pain.

On January 16, 2014, petitioner presented for follow up of ulcerative proctitis. Pet. Ex. 9 at 265. The record documents "no systemic symptoms, no head symptoms, no neck symptoms…no musculoskeletal symptoms, no neurological symptoms…" Pet. Ex. 9 at 265.

The following day, January 17, 2014, petitioner presented for removal of the lesion/lump she previously complained about on her left fifth finger. Pet. Ex. 9 at 260-61. She reported a papular like lesion on the palmar surface of her left 5th finger present for 3 months. Pet. Ex. 9 at 262. The lesion was removed, and petitioner was educated on how to recognize skin cancer. Pet. Ex. 9 at 261. The record does not document any complaint of shoulder pain.

Petitioner had a telephone encounter on January 29, 2014 in which the results of the lesion removed from her left fifth finger were explained. Pet. Ex. 9 at 257-58.

On January 30, 2014, petitioner presented to her gynecologist for dyspareunia. Pet. Ex. 9 at 254-56. She was prescribed Premarin cream. Pet. Ex. 9 at 256. The record does not document any complaint of shoulder pain.

On March 7, 2014, petitioner presented to her PCM for trouble reading and four months of left shoulder pain possibly from picking up her newborn so frequently. She denied trauma, redness, bruising or swelling. She reported pain on certain motions and rated her pain severity a four out of ten. Upon examination her physician found tenderness along her left deltoid and abnormal motion. Pet. Ex. 9 at 251-53. The record noted that petitioner was "feeling pain free today." Pet. Ex. 9 at 251. She reported that her husband's friend performed a "Graston"[8] procedure which had helped. Pet. Ex. 9 at 248, 252. She was referred to physical therapy ("PT"). Pet. Ex. 9 at 253.

---

[7] Dyspareunia is the occurrence of vaginal pain during sexual intercourse. STEDMAN'S MEDICAL DICTIONARY § 273400 (2015), Westlaw.

[8] During his testimony, Dr. McFadden explained the Graston procedure as soft tissue mobilization. Stainless steel bars are used to scrape the soft tissue and release the muscle tension that causes pain. Tr. 100.

On March 18, 2014, petitioner attended her PT evaluation. She reported left shoulder pain with onset when turning to the left to pick up her baby five months ago. She reported that rest did not help, and the pain kept her up at night.  She reported less noticeable pain when she was not carrying her son as much. Pet. Ex. 9 at 245. She reported that her husband is a doctor and diagnosed the source of her pain as supraspinatus infraspinatus. Pet. Ex. 9 at 245. Her husband's friend did a maneuver that helped with the pain. Pet. Ex. 9 at 246; *see* Pet. Ex. 9 at 249.

Petitioner returned to her gynecologist for follow up of dyspareunia on March 25, 2014. Pet. Ex. 9 at 243-44.

Petitioner attended four PT sessions through April 4, 2014 and reported that her pain had been reduced to a two out of ten. Pet. Ex. 9 at 230-42.

On April 4, 2014, petitioner called the Vaccine Health Center Clinic to report arm pain after a flu vaccine received on October 5, 2013. She reported that the "vaccinator was standing up and she was seated when the shot was injected." She recalled telling her husband that "it hurt a lot". Pet. Ex. 9 at 229. She reported that she received the vaccine in the Pediatric Clinic that was giving flu shots that day at Camp Foster. She recalled having pain about five days later which has continued until the present. It hurt with certain movements. *Id.*  The assessment and plan on the record stated, "Arthralgia – Shoulder Region Left. May be due to influenza injection given high in the deltoid area near bursa. Will see and examine patient when she comes to NoVa[9] area in latter part of April '14." *Id.*

On April 30, 2014, petitioner presented to Dr. Montgomery at the Vaccine Health Center Clinic in Fort Belvoir Community Hospital in Fort Belvoir, Virginia. She reported left shoulder pain for seven months. She reported that she was not involved in strenuous activity beyond carrying her newborn son. She reported the onset of focal left shoulder pain within about 24 hours of receiving a flu shot in October. She indicated that the site of injection was high and anterior on her deltoid. She recalled no redness bruising or swelling of the area. The pain reached a peak within about 5 days; it waxed and waned with activity. She tried Motrin and PT without significant or long-lasting relief. The pain was localized high on her deltoid and would radiate mid-way down her lateral arm. She denied weakness, distal paresthesia, or loss of range of motion. She noticed the most discomfort with internal rotation/adduction of her arm. Pet. Ex. 3 at 1. Physical examination revealed no deformity of the acromioclavicular joint or atrophy of the supraspinatus or the infraspinatus muscles; there was isolated tenderness to palpation of the anterior superior left deltoid. There was no tenderness of the acromioclavicular joint or subacromial tenderness and no palpable trigger points around the shoulder. There was no loss of active and passive ranges of motion. The Apley scratch test, Hawkins' test, empty can supraspinatus test and cross-body adduction test were all negative. Yergason's test for biceps tendonitis and internal rotation were positive, producing pain in her upper arm. Axial-loading of the cervical spine did not produce pain. Dr. Montgomery's assessment was arthralgia of the left shoulder. Pet. Ex. 3 at 1; Pet. Ex. 9 at 226-27. Dr. Montgomery opined: "In the absence of other etiology, and given the vaccination technique, SIRVA is a likely diagnosis." Pet. Ex. 3 at 1-2; Pet. Ex. 9 at 227.

---

[9] NoVa is an abbreviation for Northern Virginia.

6

Petitioner returned to Fort Belvoir for an MRI of the left shoulder on May 2, 2014. She reported seven months of pain. Pet. Ex. 4 at 1-2; Pet. Ex. 10 at 2-3. The MRI revealed no joint effusion, cartilage intact without defect, labrum unremarkable, mild tendinopathy of the rotator cuff tendon, no evidence of tear, mild muscle edema. Pet. Ex. 4 at 1. The impression was small intrinsic tear/strain to the very distal muscle fibers of the subscapularis, the tendon itself was unremarkable through the insertion. Pet. Ex. 4 at 1; Pet. Ex. 9 at 223. Petitioner called the next day for the result of her MRI. She was advised that the MRI showed a small tear in the distal muscle fibers of the shoulder. She was given instructions for when she returned to Okinawa. Pet. Ex. 9 at 222-23.

On May 9, 2014, petitioner presented for follow up at Fort Belvoir and requested PT for left shoulder injury that occurred "after a vaccine injection." Pet. Ex. 9 at 217.

Petitioner returned to her primary care physician in Okinawa on July 7, 2014, requesting follow up on medication and refills. Pet. Ex. 8 at 1. She had a long history of asthma well controlled on Singulair and Zyrtec. She reported feeling well. She reported pain in the left shoulder with movement. Pet. Ex. 8 at 1. She reported 30 minutes most days of moderate exercise. Pet. Ex. 8 at 3.

On July 29, 2014, petitioner returned to PT reporting left shoulder pain since October of 2013. She avoided activity that included her left shoulder. Her pain was reported as three to six out of ten. Pet. Ex. 9. at 208. She attended PT on August 4, 2014 and August 7, 2014 with a report of pain at three to four out of ten and zero to one out of ten, respectively. Pet. Ex. 8 at 205; 203. On August 18, 2014, she reported she was improving and had begun to swim a little. Pet. Ex. 9 at 197. By August 28, 2014, she reported swimming twice a week, but her pain increased when holding her son. Pet. Ex. 9 at 192. On September 15, 2014, she was "doing better" and was swimming freestyle with no pain. All PT goals were noted as met. Pet. Ex. 9 at 182-83.

Petitioner had no other medical visits related to her left shoulder.

On November 6, 2015, petitioner presented for a flu vaccine. The record notes no prior reaction to vaccines. Pet. Ex. 9 at 135.

As of July 22, 2016, petitioner reported that she engages in 150 minutes of moderate intensity exercise per week and muscle strengthening activities two or more days a week. Pet. Ex. 9 at 114.

### B.  Affidavits and Hearing Testimony

#### a.  Petitioner's Affidavits and Hearing Testimony

On September 14, 2016 and June 2, 2017, petitioner signed affidavits affirming that while her son was in the neonatal intensive care unit ("NICU") at the United States Naval Hospital in Okinawa, Japan [following his birth on September 19, 2013], she was administered a flu vaccine. Pet. Ex. 2 at 1; Pet. Ex. 15 at 1. Petitioner testified that she was living at the hospital from the time

her son was born until October 10, 2013, when he was transferred by medevac to Oahu, Hawaii. Tr. 8. It was during this time at the hospital that she received the flu vaccination on September 28, 2013. Tr. 11; Pet. Ex. 2 at 1; Pet. Ex. 15 at 1. Petitioner explained that her primary focus was caring for her son, and in doing so, it was very important for her to get the flu vaccine as she was cognizant of not bringing the flu virus into the NICU and cautious with her own asthma condition. Tr. 9, 33. According to petitioner, the United States Naval Hospital was holding a flu shot clinic for military dependents at the pediatric clinic in the hospital which is where petitioner received her vaccine. Pet. Ex. 15 at 1. Petitioner described the clinic as a "mass immunization clinic" where they were "funneling people in and out of the clinic to get their shot." Tr. 10.

According to petitioner, the shot was administered while she was seated, by a hospital corpsman who was standing. Tr. 10; Pet. Ex. 15 at 1. Petitioner specifically recalled asking the corpsman if she could sit down because she had been standing up for a while and, having just had a C-section, was uncomfortable. Tr. 10, 79. She stated that the injection was administered high and anterior on her left deltoid. Tr. 11; Pet. Ex. 15 at 1. According to petitioner, she experienced immediate discomfort. Tr. 31; Pet. Ex. 15 at 1. She affirmed that when she returned to the NICU, she told her husband that the shot was very painful. Tr. 10; Pet. Ex. 15 at 1. Petitioner stated the pain grew within hours and continued to worsen, reaching its apex within five days, "by which time it was a struggle to merely lift my newborn son." Pet. Ex. 15 at 1. She testified that she continually told her husband that her shoulder hurt and that the pain peaked at day five, "particularly when I went to grab my son or pass him off." Tr. 12. Petitioner stated that prior to September of 2013, she had no shoulder pain or discomfort. Pet. Ex. 2 at 2.

Petitioner acknowledged calling her primary doctor to refill routine prescriptions on September 26, 2013. Tr. 34.

Petitioner explained that due to her son's health crisis, being evacuated to Hawaii and ultimately to Seattle, she was forced to set aside her shoulder pain. Pet. Ex. 15 at 1. Petitioner testified she did not even receive post-partum obstetrical care despite having a C-section during this time because her husband would know if she needed exigent care. Tr. 16; Pet. Ex. 15 at 1. Petitioner further testified that her husband, as a physician, told her that her shoulder would probably need physical therapy, which she did not want to start in Hawaii. Tr. 40. Petitioner explained that transferring care coverage to another region would be difficult and not necessarily practical as they did not know how long their stay would be in Hawaii. Tr. 40. Petitioner also testified that their time in Hawaii was a "horrible situation." Tr. 40. She described a hotel room above the hospital which was infested with cockroaches and termites. Tr. 37. She and her husband did not go out much since they were on medevac orders. Tr. 39. She was breastfeeding on demand, sleep-deprived, and her husband was dealing with her son's complicated insurance coverage. Tr. 40. As a first-time mother dealing with the stress of her son's condition, she admitted, "I was kind of falling apart…" Tr. 16.

Petitioner addressed a medical record dated October 29, 2013, during their time in Hawaii, that references a phone call she made to set up a punch biopsy. She explained that being fair skinned she is "cognoscente of protecting myself against any marks/moles leading to potential skin cancer." Petitioner confirmed that the appointment was "unrelated to [her] shoulder pain and was solely intended to avoid any further issues from a concerning sunspot." Pet. Ex. 15 at 2. During

her testimony, petitioner further explained that she had seen a dermatologist all her life and made time for a phone call to discuss a punch biopsy because she thought it was cancer. Tr. 36. Her mother, who previously had skin cancer spots removed, was the one who noticed the spot following Patrick's birth. Her mother was concerned and encouraged petitioner to get the spot examined. Tr. 22. A dermatologist had also previously told her that she may develop skin cancer by the time she turned thirty years old; so, despite being preoccupied with caring for her son, petitioner was quite concerned about her skin. Tr. 36. As to why she did not mention shoulder pain in the phone call requesting a biopsy, petitioner explained that military medical appointments are scheduled for specific concerns; one does not mention multiple or unrelated concerns for one appointment. Tr. 22. Petitioner would not mention shoulder pain to dermatology and her shoulder pain was at a different location than her skin spot. *Id.*

Petitioner testified that she and her husband did not know how long they would be in Hawaii and did not expect to be transferred to Seattle at the end of November of 2013. Tr. 15, 18. According to petitioner, her shoulder and upper arm pain worsened throughout this period of her son's treatment in Hawaii and Seattle. Pet. Ex. 2 at 2; Pet. Ex. 15 at 1. Petitioner testified "there was constant pain with certain motions." Tr. 47. Even though she tried to minimize motions that generated pain, "you can't compensate completely." Tr. 47. Despite the pain, petitioner explained that scheduling an appointment with a military physician and having to change TriCare coverage was not her priority. Tr. 18; Pet. Ex. 15 at 1-2. "It was just a situation where I was not the patient of concern. What I was focused on completely and utterly was my son, and, you know, it was my first child…. My whole world was on my son and not on myself and the shoulder pain that I was experiencing." Tr. 13.

Petitioner affirmed that upon her return to Okinawa in December of 2013, she still had much to do to take of her son, who had been diagnosed with sleep apnea. Tr. 17; Pet. Ex. 15 at 2. She testified that from the time of his birth, to Oahu, Seattle and back to Okinawa, "my son was still my primary concern. I was a first-time mom. My husband had a very busy job, and I didn't have a lot of friends on the island." Tr. 19.  She could not make appointments for herself until she was able to find a reliable babysitter. Pet. Ex. 15 at 2. "I didn't have anybody to leave Patrick with to go to the hospital and take care of myself." Tr. 19.

Petitioner addressed her various January 2014 visits to medical providers upon her return to Japan stating that she did not mention any shoulder pain because, not having experienced musculoskeletal injuries before, she "naively expected the ongoing pain to simply disappear." Pet. Ex. 15 at 2-3. She further explained that when she made these appointments for her skin, genitourinary, and gastrointestinal issues, her understanding was each appointment addresses only one issue. "Our appointments are 20 minutes long, and the physician or the physician's assistant isn't going to address multiple issues at one time. That's not how it works." Tr. 22. Petitioner addressed the punch biopsy of her left shoulder stating it was "not the same location as the [shoulder] pain…It was kind of more toward my neck. It was a spot of concern." Tr. 22, 51-52. Petitioner further testified that her report of 0 out of 10 pain was related to the spot to be biopsied, which was not painful. Tr. 51. Petitioner testified that the genitourinary appointment on January 8, 2014, was for vaginal pain, a more pressing issue and "not something that you're going to want to put off." Tr. 53. Finally, the January 16, 2014 visit for ulcerative proctitis was a chronic health issue for her and though she was asymptomatic, she was very careful about her condition because

her mother-in-law passed away from colon cancer. Tr. 54. She agreed that the record documented no musculoskeletal complaints but stated she would not tell the GI doctor about a musculoskeletal issue, just like she would not tell the gynecologist about shoulder pain when she was there for vaginal pain on January 30, 2014. Tr. 55-56. Petitioner further added that the doctors at these visits do not check for all the symptoms, they just note, "no symptoms" for everything unrelated the visit. Tr. 74.

When explicitly asked why she did not seek treatment for her shoulder until March 2014, petitioner testified, "It just wasn't something that –you know, it was a complaint that I had with certain ranges of motion. I was compensating for it, and it was something that I honestly thought was going to go away and that I didn't need to seek care for. I had my husband encouraging me to seek care for it, but he said you're probably going to have to do physical therapy. And I thought to myself, what a nightmare. Who's going to watch our child?" Tr. 58. Petitioner testified that all the issues she saw doctors for in January of 2014 "were more pressing" than her shoulder pain. Tr. 22.

Petitioner ultimately sought care for her shoulder "because activities like closing the car door just got to a point where it was unbearable, the pain…and then other things like lifting up an iPad, which is pretty light, in a certain range of motion, I couldn't do it without significant pain." Tr. 21. She testified about seeing her husband's coworker for a Graston procedure sometime later in February or early March of 2014 "because that's what was easy. My husband was able to just take me upstairs and have his coworker look at my shoulder while my husband held my son." Tr. 20.

Petitioner explained her various reports of onset.  On March 7, 2014 when she presented to the PMC, she did not have a calendar but wanted her providers to know that the "pain had been ongoing since shortly after the birth of her son." Pet. Ex. 15 at 2; Pet. Ex. 9. at 251. "I gave them a ballpark, you know, it's been hurting four or five months because I knew that it had been hurting since around the time that Patrick had been born. But I'm not sitting there holding a calendar and saying, okay, my shoulder started hurting on this day" Tr. 23. She stated at the time, she did not know what caused her shoulder pain, thinking perhaps it was holding her newborn son that caused her shoulder to hurt. Tr. 24. Respondent's counsel pointed to the record that documents petitioner as pain free at this visit. Petitioner disagreed with the record stating the physician was not writing at the same time as petitioner was speaking, she had pain at that visit otherwise she would not have been pursuing physical therapy. Tr. 48-49.

Petitioner was then asked why on March 18, 2014, she provided a five-month history of shoulder pain when her son was six months old. Petitioner responded that she is "not that kind of mom typically. I just was happy that I'd had my son" Tr. 79; Pet. Ex. 9 at 245. Petitioner was asked what she meant when she reported the pain was less severe when she was not carrying Patrick as much. She stated she meant the pain was less noticeable. Tr. 50; Pet. Ex. 9 at 245. The record recorded her pain level as at "least 3." Pet. Ex. 9 at 245.

Petitioner further explained that in March of 2014, her husband attended a seminar at which he spoke to an immunization healthcare expert from Fort Belvoir, Virginia and learned of SIRVA injuries. Pet. Ex. 2 at 2. When her husband returned home, he gave her a business card for Jeannette William and suggested she call for information regarding her shoulder. Tr. 24. Petitioner spoke

with Ms. Williams, who asked her a series of detailed vaccine administration questions, and after the discussion suggested petitioner go to Fort Belvoir to see Dr. Montgomery. Tr. 25, 76. The record for the April 4, 2014 phone call noted that petitioner reported pain starting five days after vaccination. Tr. 60; Pet. Ex. 9 at 229.  Petitioner explained five days after vaccination was when the pain peaked. Tr. 70.

Petitioner stated that she presented to Dr. Montgomery in Northern Virginia on April 20, 2014.[10] Pet. Ex. 2 at 2. Petitioner testified that even when attending her appointment with Dr. Montgomery, she did not know the vaccine was in fact the cause of her injury, "I didn't go into that appointment with any preconceived notions, or you know, I don't go to the doctor to tell them what my diagnosis is." Tr. 25-26. The record by Dr. Montgomery notes that petitioner's pain began within 24 hours after vaccination. Tr. 62. Petitioner testified that the record was correct and that she experienced pain immediately after vaccination. Tr. 63.

According to petitioner, after returning to Okinawa from Northern Virginia, she underwent physical therapy from July of 2014 through September of 2014. The therapy provided improvement, but the pain waxed and waned for over a year. Pet. Ex. 2 at 2. The record from petitioner's first physical therapy visit documented "left shoulder pain since October 2013" as her chief complaint. Tr. 62. Petitioner stopped physical therapy appointments after September 15, 2014 because she had to secure a babysitter every time she went, and the therapist told her she could do the exercises at home which required little to no equipment. Pet. Ex. 15 at 3. Her shoulder pain was well controlled at that time as well. Pet. Ex. 15 at 3. Petitioner affirmed that she then aggravated her shoulder carrying her son after a flight back to Northern Virginia in 2015. Mentioning that her son weighed thirty-five pounds at that time, she testified that "the physical therapy was essentially ruined." Tr. 27; Pet. Ex. 2 at 2. Therapy no longer was helpful. Pet. Ex. 2 at 2. While she did not return to a formal physical therapy regimen, petitioner testified that she saw a friend, John Hill for physical therapy sessions, intermittently, off-the-record, between 2014 and 2016. Tr. 66-67.

Petitioner submits that she is healthy, athletic and was previously a competitive swimmer. She also used to participate in triathlons and half marathons. She states she is no longer able to run or swim any stroke other than freestyle or perform the simplest of daily tasks that require raising her left arm. Pet. Ex. 2 at 3. Even when swimming freestyle, petitioner testified that she experiences some pain. Tr. 27. She cannot sleep on her left side. Tr. 71; Pet. Ex. 2 at 3.

### b. Affidavit and Testimony of Petitioner's Husband

Dr. McFadden, a family medicine practitioner in the military, affirmed that in September of 2013 his son was born and hospitalized in the NICU for what was later determined to be sleep apnea. The first three months after his birth were spent in the NICU and living out of hotels in Hawaii or Seattle. Tr. 84-87; Pet. Ex. 16 at 1.

Dr. McFadden recalled petitioner receiving a flu vaccine at the hospital while their son was in the NICU. Pet. Ex. 16 at 1. Dr. McFadden explained that the hospital held mass immunization clinics. Tr. 90. He recalled petitioner reporting how painful her shot was when she returned from

---

[10] This is incorrect. Petitioner saw Dr. Montgomery on April 30, 2014. Pet. Ex. 3 at 1.

the clinic; "I distinctly remember her telling me that that was the most painful immunization shot that's she's ever received in her entire life. And that's a direct quote". Tr. 90; Pet. Ex. 16 at 1. According to Dr. McFadden, petitioner "reported a continued burning sensation in her shoulder over the next several days." Tr. 91; Pet. Ex. 16 at 5. Dr. McFadden stated vaccines hurt and the arm is frequently sore, so he was not overly concerned about petitioner's complaints and "really just brushed them off at that time." Pet. Ex. 16 at 5. He stated they had "bigger things on [their] plate," and even though petitioner complained to him, he "really just pretty much blew her off, to be honest." Tr. 91-92.

According to Dr. McFadden, petitioner's shoulder pain became "significantly worse" within two weeks of receiving the vaccine. It was about that same time they were told their son needed to be transferred to Hawaii. Dr. McFadden stated when they went to Hawaii, he noticed that she started complaining more, she struggled with holding their son, and her shoulder affected her ability to sleep. Tr. 93; Pet. Ex. 16 at 2. Dr. McFadden stated he thought petitioner's complaints were from overuse as a new mother, though their son only weighed ten pounds at the time. He was "baffled as there was no trauma to explain the injury but figured she had strained a muscle somehow." Pet. Ex. 16 at 2. But the top priority was their son and he expected her shoulder would heal as musculoskeletal injuries naturally do. Pet. Ex. 16 at 2. Dr. McFadden testified that he ultimately was the one primarily carrying their son for the first three months of Patrick's life. Tr. 93. Dr. McFadden affirmed when the symptoms and weakness did not improve, he became more concerned, but being away from Okinawa, he knew she could not get a referral for therapy. Pet. Ex. 16 at 2.

Dr. McFadden explained that about twenty-five percent of his practice deals with shoulder-related injuries. The two biggest joint complaints he sees are knees and shoulders. Tr. 106. However, "I have never read or heard about SIRVA in any setting aside from my Vaccine Leaders Course in Okinawa when it was first brought to my attention that this may have been the source of her pain. Had I been aware of the diagnosis previously I would have had her seek appropriate care sooner." Pet. Ex. 16 at 5. Dr. McFadden could not recall if he specifically examined her left shoulder, though he "probably had her do certain motions." Tr. 106, 111. He thought her pain was rotator cuff tendinopathy, an overuse type of injury— "I just marked it up to one of those because that's the most common things we see." Tr. 93-94; Pet. Ex. 16 at 2. However during testimony, Dr. McFadden admitted his theory at the time was probably not the best because she did not pick her son up much at the hospital—he always handed their son to her—and because she was not going to the gym around the time of Patrick's birth. Tr. 94. Dr. McFadden testified he told her the treatment would be physical therapy and that they "decided to delay her getting care until we got back to Okinawa." Tr. 94. Dr. McFadden explained that getting care at Tripler in Hawaii would have required them to change their care region officially, schedule a new primary care manager, receive an evaluation, and potentially wait up to four weeks before receiving a referral. Tr. 95. He testified "it just didn't make sense to start that process" when they did not intend to be in Hawaii for long, especially given that physical therapy is "something that you have to continue to do and follow up and see the provider over and over." Tr. 95-96. Dr. McFadden also explained that his wife put off post-delivery care [following a C-section] as well, until nearly three months after delivery. Tr. 97; Pet. Ex. 16 at 4. She did not receive care at any civilian or private facilities during the time they were in Hawaii and Seattle. Pet. Ex. 16 at 4.

Dr. McFadden affirmed they returned to Okinawa in December of 2013. Petitioner was visibly suffering from shoulder pain, altering her activities to avoid moving the arm, and putting off going for medical care being a busy new mother. Tr. 96; Pet. Ex. 16 at 2. He testified that petitioner did not seek shoulder care until March because she was very busy during that time period and basically "chose to delay [care for her shoulder] until she knew she was going to have the time to commit to doing the therapy properly." Tr. 97. He testified that Patrick was able to stop using the pulse oximeter and taking caffeine at around seven months, March/April, which gave petitioner more available time. He added that they had just arrived in Okinawa in July 2013, shortly before petitioner gave birth, and had not made any friends. "[B]y the time we're in nine months in the future… we were more acclimated to the island. We had more friends that we trusted to kind of step in, and there was definitely a better opportunity."[11] *Id.*

Dr. McFadden testified that at one point he took petitioner to see his physical therapist colleague, John Hill. "He is drastically more qualified than your typical physical therapist, and I trusted him more than just some random physical therapist at the hospital." Tr. 99. John Hill offered to and performed the Graston procedure for petitioner. Tr. 100.

Dr. McFadden testified that as the Officer In Charge of the medical clinic in Okinawa and part of his official duties, he attended a three-day Immunization Leader's Course on March 12-14, 2014 where he learned of SIRVA injuries. Tr. 101; Pet. Ex. 16 at 3. After the presentation, he spoke to the presenter who worked with the Armed Forces Immunization Healthcare Center in Virginia. The presenter encouraged him to have petitioner call her and gave him her card. Tr. 102; Pet. Ex. 16 at 3. Dr. McFadden stated he did not explain SIRVA to petitioner when he returned but suggested that the vaccine may have caused her shoulder pain and asked her to call the presenter, Jeanette Williams. Tr. 103. He stated the booklet they received at the seminar did not specifically discuss SIRVA. Tr.103. During their next trip back to Northern Virginia, petitioner followed up with the Immunization Center, was evaluated there, and was diagnosed with SIRVA. Pet. Ex. 16 at 3. According to Dr. McFadden, an MRI of petitioner's shoulder showed a rotator cuff tear. Pet. Ex. 16 at 3.

According to Dr. McFadden, petitioner completed a formal course of PT at the hospital, and "worked off the books with a physical therapist" from Dr. McFadden's clinic "another dozen times in an attempt to stabilize the shoulder and improve her pain." Pet. Ex. 16 at 3. Dr. McFadden confirmed that the physical therapist he was referring to was his colleague, John Hill. Petitioner would occasionally visit John Hill when she and Patrick brought Dr. McFadden lunch. Tr. 99. Dr. McFadden also testified that he "had her check in with John Hill from time to time to see if there were any additional exercises that he recommended or anything that she should be adding." Tr. 104. He stated that petitioner is diligent in performing her shoulder exercises but still suffers daily pain, needs to modify her activities, and has difficulty swimming which really bothers her. He must bear "the brunt of" carrying their son who was now over 40 pounds. Pet. Ex. 16 at 3.

Dr. McFadden explained the process in which the military administers mass vaccination for maximal effect adding that the documents are not uploaded in the same fashion as childhood vaccinations or other vaccines that are given year-round. Petitioner received her flu vaccine during one of these periods. Tr. 89-90; Pet. Ex. 16 at 3-4.

---

[11] Nine months after July 2013 would be March 2014.

Dr. McFadden also explained that petitioner did not receive any post-delivery care for three months due to their son being their priority. Being a physician who performs post-obstetrics examinations for his patients, he was capable of checking her C-section wound and providing general post-partum care without the "hassle" of changing her Tricare region, "just so she could have a routine post-partum visit…a huge hassle for minimal benefit." Tr. 97; Pet. Ex. 16 at 4.

Dr. McFadden reviewed the Vaccine Health records to answer questions for his affidavit. He confirmed he was with his family the entire duration of the medevac. Pet. Ex . 16 at 5.  As far as a timeline of events, he recalls her complaint immediately after the vaccine, significant pain throughout the rest of that day and several days thereafter. He recalled that she again complained regularly of her shoulder pain around the time their son was discharged from the hospital. Tr. 91; Pet. Ex. 16 at 6. Even though petitioner complained to him about her shoulder and he noticed her grimace when holding their son, he admitted that he was not supportive of her seeking care for her shoulder. *See* Tr. 91-92. At the hearing, Dr. McFadden admitted to blowing petitioner off, telling her that they could not deal with her shoulder pain. *Id.*

## III.  DISCUSSION

### A.  Applicable Legal Standard

Petitioner bears the burden of establishing her claims by a preponderance of the evidence. § 13(a)(1). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for making determinations in Vaccine Program cases regarding factual issues, such as the timing of onset of petitioner's alleged injury, begins with analyzing the medical records, which are required to be filed with the petition. § 11(c)(2). Medical records created contemporaneously with the events they describe are presumed to be accurate and "complete" such that they present all relevant information on a patient's health problems. *Cucuras v. Sec 'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). This presumption is based on the linked proposition that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in an accurate manner, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec 'y of Health & Human Servs*., No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec 'y of Health & Human Servs.,* 26 Cl. Ct. 537, 543 (1992), *aff'd,* 993 F. 2d. 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred"). In making contemporaneous reports, "accuracy has an extra premium" given that the "proper treatment hang[s] in the balance." *Id.* A patient's motivation for providing an accurate recount of symptoms is more immediate, as opposed to testimony offered after the events in question, which is

considered inherently less reliable. *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993); *see Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948)). Contemporaneous medical records that are clear, consistent, and complete warrant substantial weight "as trustworthy evidence." *Cucuras*, 993 F.2d at 1528. Indeed, "where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Id.*

However, there are situations in which compelling oral testimony may be more persuasive than written records, such as in cases where records are deemed to be incomplete or inaccurate. *See Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."). The Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be given. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is used to overcome the presumption of accuracy given to contemporaneous medical records, such testimony must be "consistent, clear, cogent and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (quoting *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *85 (Fed. Cl. Spec. Mstr. June 30, 1998)); *see, e.g.*, *Stevenson ex rel. Stevenson v. Sec'y of Health & Human Servs.*, No. 90-2127V, 1994 WL 808592, at *7 (Fed. Cl. Spec. Mstr. June 27, 1994) (crediting the testimony of a fact witness whose "memory was sound" and "recollections were consistent with the other factual evidence"). Moreover, despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Vallenzuela v. Sec'y of Health & Human Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Human Servs.*, No. 90-175V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb 18, 1994) (explaining that § 13(b)(2) "must be construed so as to give effect to § 13(b)(1) which directs the special master or court to consider the medical record...but does not require the special master or court to be bound by them"). Special Masters may find onset within the time period described in the Vaccine Injury Table even if the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period. § 13(b)(2). In short, all relevant evidence on the record must be considered. *See* § 13(b).

## B.  Evaluation of the Evidence

A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame [within 48 hours of vaccine administration];

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

The issue to be determined here is the onset of petitioner's alleged SIRVA injury as a result of a flu vaccine she received on September 28, 2013. The records document reports of onset as September 28, 2013, October 3, 2013, and sometime in October of 2013. *See* Pet. Ex. 9 at 226, 229, 245, 251. Petitioner and her husband testified at the onset hearing but were sequestered during each other's testimony. Scheduling Order at 1, ECF No. 49.

### a. Credibility of Petitioner's Testimony

For petitioner's testimony to overcome the presumption that contemporaneous records are complete and accurate, petitioner's testimony must be "consistent, clear, cogent, and compelling." *See Sanchez*, No. 11-685V, 2013 WL 1880825, at *3. A determination of a petitioner's credibility must be made in assigning weight to petitioner's testimony. *See Andreu*, 569 F.3d at 1379. Here, I found the petitioner to be credible and her testimony compelling, consistent and of sufficient weight to overcome the presumption of accuracy afforded contemporaneous medical records. Her testimony of the events surrounding her receipt of the flu vaccine and over the next six months were further bolstered by her husband's testimony.

Petitioner's credibility is found in her reasonable and consistent explanations as to why she did not seek medical care for her left shoulder pain until March of 2014 and why she did not report left shoulder pain during her contacts with medical providers between her vaccination and March of 2014.

Petitioner reasonably explained why she did not seek immediate care for her shoulder pain between vaccination and October 10, 2013, when they were transferred from Japan to Hawaii. During this period, petitioner was recovering from her C-section, her son was in the NICU, she was breast-feeding on demand, and physicians did not know what was causing her son's breathing problems. Tr. 8, 11. She explained "she was not the patient of concern." Tr. 12; Pet. Ex. 15 at 1. "I was living and breathing what was going on with my son because at that point we didn't know was going on, and you don't expect when you're a first-time mom to have any of that happen." Tr. 13. She admitted due to the stress of her son's condition, "I was kind of falling apart…" Tr. 16.

Her affidavit and testimony are further supported by her husband's testimony. Recalling his wife's immediate complaints after the vaccination, he admittedly "blew it off" and "didn't make much of it." Tr. 91. He testified they "had bigger things on [their] plate," referring to their newborn son's condition. *Id.* Despite petitioner's continued complaints to him about her shoulder pain and having noticed her grimaces when holding their son, he admitted that he was not supportive of her seeking care for her shoulder. *See* Tr. 91-92. He testified:

> "I feel guilty about it now… I tended to downplay my wife's conditions and tell her, you know, you had an immunization, it's supposed to be sore, let's focus on what's going on here. We don't need something else to worry about right now. And, so, I just pretty much blew her off, to be honest." Tr. 91-92.

Further, petitioner explained her limited contact with her care providers during the time her son was being treated in Hawaii and Seattle. Petitioner testified about their stay in Hawaii, the horrible conditions in which they had to live, and her being "in newborn mom mode, sleep-deprived" and worried about her son's condition. Tr. 37-40. They did not know how long they would be Hawaii or that they would ultimately be transferred to Seattle. Tr. 39. She relied on her husband, who has sports medicine experience, when he told her that treatment for her left shoulder pain would most likely be physical therapy. Tr. 40. Petitioner explained that transferring their medical care coverage would be difficult and she was not looking to start physical therapy in a temporary location. *See* Tr. 40. Dr. McFadden's testimony corroborated petitioner's statements. He recalled telling petitioner she would need physical therapy to treat her shoulder pain so they "decided to delay her getting care until we got back to Okinawa." Tr. 94. He explained that getting care transferred could take up to six weeks and since they did not anticipate being in Hawaii that long, "it just didn't make sense to start that process." Tr. 96. Consistent with this reasoning, petitioner even postponed her post-caesarian obstetrical care throughout the entire period they were away from Japan. Tr. 97.

The contacts petitioner did have with her medical providers between the date of vaccination and March of 2014 were all for concerns petitioner felt were more urgent or severe. On October 23, 2019, petitioner made a phone call requesting a punch biopsy of a spot on her upper left shoulder; she went for the biopsy on January 3, 2014. Pet. Ex. 9 at 271, 277-78. Petitioner affirmed being very vigilant with her skin care because she was fair. Pet. Ex. 15 at 2. Though still primarily concerned with her son, she was worried about possible skin cancer having been previously warned by dermatologists that she may develop skin cancer by the time she turned thirty. Tr. 36. At the end of 2013, petitioner was twenty-five. It is understandable, particularly for a new mother, why the prospect of skin cancer may be alarming, or "more pressing" than a musculoskeletal issue. Tr. 22. Additionally, the skin spot had been pointed out to her by her mother, who previously had skin cancer removed. *Id.* The gravity of her concern was in the fact borne out by this being the first medical visit she attended upon returning to Japan. She addressed her genitourinary appointment on January 8, 2014, testifying that her vaginal pain, which was documented at a pain level of "8/10" was "not something that you're going to want to put off." Tr. 53; Pet. Ex. 9 at 255, 267. Petitioner also testified to her ulcerative proctitis appointment on January 16, 2014 explaining that though asymptomatic, she was very careful about her chronic gastrointestinal condition because her mother-in-law passed away from colon cancer. Tr. 54. Having not had any medical care since the birth of her son in September of 2013, it was understandable why petitioner presented for her

most serious concerns in January upon her return to Japan. Further, addressing these more pressing concerns was reasonable, particularly in light of her husband, a physician who routinely treated shoulder injuries, assuring her that she would be fine but would likely need physical therapy which was something she could not commit to at the time.

The records contain no report of shoulder pain to any medical provider between her vaccination and March of 2014. Petitioner did not mention left shoulder pain during her October 29, 2013 phone call requesting a biopsy. Pet. Ex. 9 at 277-78. She reported "0 out of 10" pain during her January 3, 2014 biopsy appointment. *Id.* at 271. She did not mention left shoulder pain at her January 8, 2014 primary care consult for dyspareunia, or her January 16, 2014 gastrointestinal ("GI") appointment for ulcerative proctitis, or her January 17 dermatology appointment, or at her January 30, 2014 gynecology appointment for dyspareunia. *See* Pet. Ex. 9 at 256-272.

However, at hearing, petitioner did not attempt to change or challenge the record but rather provided cogent explanations for why she did not mention left shoulder during these medical contacts. Petitioner explained how the military medical system works—an appointment is made to address a specific concern and one does not mention multiple or unrelated concerns at one appointment. Tr. 22, 51. "Our appointments are 20 minutes long, and the physician or the physician's assistant isn't going to address multiple issues at one time. That's not how it works." Tr. 22. Petitioner specifically addressed the appointments she attended. She testified that her visit to the dermatologist was for a concerning spot on her left shoulder located closer to her neck and not in the same location as her left shoulder pain; as they were not related, she would not have mentioned her shoulder pain to dermatology. Tr. 22. Petitioner further testified that she likely reported 0 out of 10 pain on January 3, 2014 related to the spot to be biopsied—there was no pain at that location of the concerning spot. Tr. 51. Petitioner agreed that the record for her GI appointment recorded no musculoskeletal complaints, but again explained that an appointment is for a single issue; she would not tell her GI doctor about a musculoskeletal issue. Tr. 55. Petitioner also explained that the doctors do not necessarily check for all the symptoms; only the one you are there for and simply report no other symptoms. Tr. 74. Petitioner similarly testified that she only reported the pain associated with her dyspareunia at her appointments for dyspareunia. Tr. 52. Lending credibility to petitioner's testimony is that the separate appointment records do not reference each other. Each record references the complaint for which petitioner presented but does not contain any other complaint for medical problems during that time. For example, petitioner's visit for dyspareunia does not reference a recent visit for a skin biopsy or ulcerative proctitis, even though these appointments all took place within the same timeframe. *See* Pet. Ex. 9 at 265-273. The absence of cross-referencing lends credibility to petitioner's testimony that only a singular issue is addressed at each appointment. *See* Tr. 22, 55. Petitioner's actions were consistent with her testimony: "I had been told repeatedly by my husband and as a provider myself that you address what you're there for and you don't just bring everything up because you have a 20-minute appointment." Tr. 51.

Lastly, petitioner's testimony was clear and consistent with her husband's more detailed testimony as to why she did not report or officially seek care for her shoulder until March of 2014. Petitioner believed her shoulder pain would potentially resolve on its own, she was focused on her son, she had little ability to leave her son, and she was told by her husband that treatment would

be physical therapy. Tr. 19, 40, 58, 96; Pet. Ex. 15 at 2-3. After returning to Japan, petitioner's continued focus was her son, who needed constant sleep monitoring and caffeine. She did not have help in caring for him and had yet to find a babysitter she trusted to leave her son with. Tr. 19; Pet. Ex. 15. "I wasn't just able to leave him. I typically can bring him to appointments, like if it's a 20 minute-appointment, but for physical therapy, you can't bring your child with you." Tr. 19, 58. Petitioner tried to tough out her shoulder pain, testifying, "I was compensating for [my shoulder pain], and it was something that I honestly thought was going to go away." Tr. 58. "I had not previously experienced musculoskeletal injuries in my life and naively expected the ongoing pain to simply disappear." Pet. Ex. 15 at 3. It was not until simple tasks such as closing the car door or "things like lifting up an iPad, which is pretty light" caused unbearable pain that petitioner officially sought care in March of 2014. Tr. 21.

Dr. McFadden's testimony was particularly compelling as to why petitioner did not seek treatment until March of 2014. In addition to having brushed off petitioner's complaints, having told her that they could not deal with her shoulder while their son needed intensive care, as well as advising petitioner she would need consistent physical therapy, Dr. McFadden was largely unavailable once they returned to Japan. Dr. McFadden testified that upon their return, he worked 14-hour days and frequently traveled. He was deployed to Korea, then Australia, New Zealand, back to Korea, Malaysia, the Philippines, the States—his schedule was just "absolute chaos." Tr. 98-99. While he was working and traveling, the petitioner was very busy. She altered her activities to avoid moving the arm and put off going for medical care as a busy new mother does. Tr. 96; Pet. Ex. 16 at 2. Dr. McFadden further testified that Patrick needed the pulse oximeter and caffeine until he was around seven months old. It was not until then that petitioner had more available time to take care of herself. Tr. 97-98. Having just arrived in Okinawa shortly before petitioner gave birth and not having made any friends or found a babysitter, petitioner also had no one she trusted to leave her son with until March/April of 2014. By that time, petitioner and her husband "had more friends that [they] trusted to kind of step in, and there was definitely a better opportunity." *See* Tr. 98. This was when petitioner finally sought care and attended physical therapy.

Overall, petitioner was a credible witness. She provided reasonable and consistent explanations as to why she did not seek medical care for her left shoulder pain until March of 2014 and why she did not report left shoulder pain during her contacts with medical providers between her vaccination and March of 2014. While the various dates of onset reported by petitioner is troubling at first blush, it is understandable how the timeframe from the birth of petitioner's son by C-section and the months that followed became a blur of days, weeks and months with no concept of time and no understanding of the import for exact reporting of onset. Furthermore, her testimony was corroborated by her husband's, as well as by medical records that aligned with her purported understanding and actions. I find petitioner credible and her testimony appropriate for use in determination of petitioner's shoulder pain onset.

**b. Determination of Onset**

So long as there is preponderant evidence, Special Masters may find onset within the time period described in the Vaccine Injury Table even if the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period. § 13(b)(2). In reviewing the record as a whole and affording significant weight to the

testimony of the petitioner and Dr. McFadden, I find that there is preponderant evidence to support the onset of petitioner's left shoulder pain within 24 hours of her September 28, 2013 flu vaccination.

Petitioner consistently associated her shoulder pain to the vaccination. While petitioner's medical record includes onset times that vary to some degree, they are generally consistent with her testimony that her shoulder pain began at the same time as her vaccination. On March 7, 2014, petitioner reported a four-month history of left arm pain, "possibly due to picking up her newborn child so much." Pet. Ex. 9 at 251-53. Petitioner explained she provided "a ballpark, you know, it's been hurting four or five months because I knew that it had been hurting since around the time that Patrick had been born. But I'm not sitting there holding a calendar and saying, okay, my shoulder started hurting on this day." Tr. 23-24.

Petitioner further testified that the March 7th record was wrong in documenting that she had no pain at that visit. She explained that the doctor was not writing at the same time she was speaking, and if she was not experiencing pain, she would not have pursued physical therapy, which is what she was seeking referral for. Tr. 49. Given that the record notes petitioner was there for shoulder pain with severity of four out of ten, yet also notes that petitioner was pain free at this visit, confirms the record is internally inconsistent. *See* Pet. Ex. 9 at 251. As such, I accord this record less deference and find petitioner's testimony more convincing and clarifying. *See* Lowrie, 2005 WL 6117475, at *19 ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting Murphy, 23 Cl. Ct. at 733)). On March 18, 2014, petitioner presented for PT evaluation and reported a five-month history of left arm pain. Pet. Ex. 9 at 245. Petitioner similarly testified that she gave an estimate during her March 18, 2014 visit, "[S]he asked me when the pain had started, and I said, you know, around the time that Patrick was born. At that point, I wasn't giving, you know specifics because I was just saying, you know, this is how long my shoulder's been hurting in general." Tr. 23. While these two March 2014 records are more general than petitioner's ultimate assertion of onset, petitioner's testimony of estimates is consistent, and her estimate of five months place her onset of pain around the time of the vaccination. Furthermore, considering all that petitioner was dealing with during this period, she reasonably did not recount every detail she experienced during the stressful period after her son was born. Petitioner's first reports of shoulder pain while seeking treatment placed onset of pain around the time of the vaccination.

Petitioner also testified that she reported, during her April 2014 appointments, immediate pain upon vaccination which peaked in five days. On her April 4, 2014 phone call with Jeanette Williams from the Vaccine Health Center, petitioner reported that she received the flu vaccine on October 5, 2013, which is incorrect, and had pain about five days after vaccination which has continued with certain movements. Pet. Ex. 9 at 229. Petitioner testified that she did not have her records in front of her during this phone call and believed her vaccination was on a Saturday after her son's birth, which is why she mistakenly provided October 5, 2013 as the vaccination date. Tr. 78. Petitioner also explained the five days after vaccination to mean "there was a peak at five days" of pain after the vaccination. While the April 4, 2014 call was the first-time petitioner provided information as to onset of her pain, petitioner explained "[t]hose details most likely came from Jeannette because she was asking me a series of questions about my vaccine." Tr. 76. Petitioner testified that she specifically recalled how the vaccine was administered because she had asked the

corpsman if she could sit down after standing up for a while and, having just had a C-section, was uncomfortable. Tr. 10, 79. On April 30, 2014, petitioner attended an appointment with Dr. Montgomery. The medical records from her visit with Dr. Montgomery were consistent with what petitioner was explaining when it noted that petitioner received the flu vaccine high and anterior on her deltoid, her shoulder pain began within 24 hours, and her pain reached a peak within five days. Pet. Ex. 9 at 226. While petitioner may have learned of SIRVA at this point, petitioner's testimony was candid and added credibility to the April 30, 2014 records. Petitioner stated:

> "[Dr. Montgomery] began asking me questions about my vaccine, and I recounted to him when the pain began and how painful the actual vaccine administration was, you know, and sitting down and telling my husband this was super painful. But even at that point, I wasn't reporting any vaccine injury or anything like that. I was just trying to figure out why my shoulder was hurting. And I told Dr. Montgomery, I think my shoulder hurts because my son was born and I was holding him a bunch. I didn't go into that appointment with any preconceived notions, or you know, I don't go to the doctor to tell them what my diagnosis is."

Tr. 25-26. Based on petitioner's reports and MRI examination, Dr. Montgomery diagnosed petitioner with a SIRVA of the left shoulder. Pet. Ex. 3 at 1-2; Pet. Ex. 9 at 227.

Lastly, but not of least significance, petitioner's testimony and documented reports of immediate and ongoing shoulder pain following vaccination were corroborated by petitioner's husband. Dr. McFadden testified, "I distinctly remember her telling me that that was the most painful immunization shot that's she's ever received in her entire life. And that's a direct quote." Tr. 90. He affirmed she immediately complained to him about the "most painful vaccine she had ever had in her entire life" and continued to complain over the next several days. Tr. 91-92, 102. Dr. McFadden recalled petitioner saying, "God, my shoulder really hurts, this is really sore," and that he saw her grimace with pain. Tr. 92. He admitted that despite her complaints, he brushed her off because he was more concerned about their son's breathing problem, "I feel guilty about it now… I really just pretty much blew her off, to be honest." Tr. 91-92. His testimony largely corroborated petitioner's testimony, even though it may have been difficult for him to admit that he minimized his wife's pain and had been upset with her shoulder complaints at the time in light of what they were dealing with. *See* Tr. 91-92. Petitioner's testimony of immediate and ongoing shoulder pain after vaccination is supported by her husband's candid testimony.

The six-month gap between petitioner's vaccination and first report of shoulder pain, as well as the inconsistencies in the record, are remedied by petitioner's consistent and corroborated testimony of immediate onset of shoulder pain. Petitioner was particularly compelling considering the challenging circumstances in petitioner's life surrounding the time of her vaccination. Petitioner was a first-time mother and had arrived in Okinawa just two months prior to the birth of her son, who upon his arrival needed emergency medical care including being sent by medevac to Hawaii then Seattle. Petitioner could not simply seek medical care during her son's treatment while outside of her husband's assigned military base. Dr. McFadden was not initially supportive of her complaints of shoulder pain or of her seeking care, reminding her that their focus was on taking care of their son. Petitioner ultimately sought care for her shoulder when she could no longer withstand the pain and had the time to take care of herself. She provided estimations when first

reporting her history of shoulder pain, but when asked detailed questions, provided more detailed answers. The inconsistences that exist in the record are largely because petitioner could not account for time and details during this stressful six-to-seven-month period after her son was born—days and weeks were a blur and memories would be unclear due to exhaustion. Petitioner's corroborated testimony, aligned with the contemporaneous records and her explanations for their content, establish that the onset of her shoulder pain within 24 hours of her vaccination.

## IV.   CONCLUSION

Upon detailed review of the record in its entirety and for all the foregoing reasons, I find that petitioner's onset of shoulder pain began within 24 hours of her September 28, 2013 flu vaccination.

Within thirty (30) days, petitioner shall review this Ruling and file a status report advising how she wishes to proceed. Petitioner may submit a demand to respondent for settlement or proceed with her claim.

Accordingly, the following is ORDERED:

**By no later than <u>Wednesday, February 10, 2021,</u>** petitioner shall file a status report advising whether she intends to submit a demand to respondent or proceed with her claim.

**IT IS SO ORDERED.**

<u>s/Mindy Michaels Roth</u>
Mindy Michaels Roth
Special Master