# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
## No. 16-1192V

Filed: October 10, 2023

```
* * * * * * * * * * * * *   *
MEGAN C. MCFADDEN,          *
                            *
          Petitioner,       *
                            *
v.                          *
                            *
SECRETARY OF HEALTH         *
AND HUMAN SERVICES,         *
                            *
          Respondent.       *
                            *
* * * * * * * * * * * * *   *
```

*Alexander Laufer, Esq.,* Eisenhower and Laufer, PC, Fairfax, VA, for petitioner.
*Mark Hellie, Esq.,* U.S. Department of Justice, Washington, DC, for respondent.

## DECISION AWARDING DAMAGES[1]

**Roth**, Special Master:

On September 23, 2016, Megan C. McFadden ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("the Program").[2] Petitioner alleged that she received an influenza ("flu") vaccination on September 28, 2013, and thereafter suffered from a Shoulder Injury Related to Vaccination Administration ("SIRVA"). *See* Petition at 1.

The matter is now before the Court for a determination of damages. For the reasons set forth below, I find that $75,000.00 represents a fair and appropriate amount of compensation.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned finds that the identified material fits within this definition, such material will be redacted from public access.

[2] The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-10 *et seq.* (hereinafter "Vaccine Act" or "the Act"). Hereafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

## I.  Procedural History[3]

The petition was filed on September 23, 2016. Petition, ECF No. 1.

Following a Ruling on Onset, respondent filed an amended Rule 4(c) Report advising that petitioner had satisfied the criteria for SIRVA and he would not defend the case. ECF No. 68. A Ruling on Entitlement issued on August 31, 2021. Ruling on Entitlement, ECF No. 77.

Attempts at resolution failed and the parties agreed that the Court should determine damages in this case. Simultaneous submissions on damages were filed on October 25, 2021. ECF Nos. 80-81. Petitioner filed a supplemental memorandum on November 22, 2021, along with a status report confirming that her damage submissions were complete. ECF Nos. 82-83. Respondent filed a status report advising of the same on January 13, 2022. ECF No. 84.

This matter is now ripe for adjudication.

## II.  Medical History

The Ruling on Onset provides a detailed medical history prior to and following petitioner's receipt of the subject flu vaccine. Only the care and treatment petitioner received for her left shoulder injury will be repeated herein as it relates to the damages sought. *See* Ruling on Onset, ECF No. 60 at 3-7.

Petitioner was born on February 19, 1988 and is now 35 years old. In the past, petitioner has suffered from cervical muscle spasms and cervical somatic dysfunction treated with osteopathic manipulation and acupuncture. The remainder of her past medical history is for the most part noncontributory. *See* Pet. Ex. 9 at 401, 378-431. The record reflects that petitioner seeks appropriate medical care when needed. *See* Pet. Ex. 9.

Petitioner gave birth on September 19, 2013 while the family was stationed in Okinawa, Japan.[4] Pet. Ex. 9 at 283, 286, 290-376; Pet. Ex. 7. As more specifically set forth in the Ruling on Onset, the infant required a high level of medical care for several months following his birth. Pet. Ex. 11 at 2-3, 9-10; Pet. Ex. 14 at 1; Pet. Ex. 13. He was ultimately diagnosed with sleep apnea, which has since resolved. Pet. Ex. 11 at 11.

Petitioner received the flu vaccine on September 28, 2013 at the U.S. Naval Hospital in Okinawa, Japan. Pet. Ex. 1 at 1; Pet. Ex. 9 at 111; Pet. Ex. 2 at 1. Petitioner affirmed that the flu vaccine was administered "high and anterior on [her] left deltoid," after which she "experienced immediate discomfort that grew to pain within hours." Pet. Ex. 2 at 1.

---

[3] A more detailed procedural history of the matter prior to the onset hearing is contained in the Ruling on Onset and is incorporated by reference herein in its entirety. *See* Ruling on Onset, ECF No. 60.

[4] Petitioner's husband is a physician and officer on active duty in the U.S. Army. Tr. 84.

Between September 28, 2013 and March 7, 2014, petitioner contacted, presented to, and/or received medical treatment from various medical providers for a host of issues unrelated to her flu vaccination. There was no mention of left shoulder pain.[5]

Petitioner was questioned about this six-month period during the onset hearing, and she explained "it just wasn't something that–you know, it was a complaint that I had with certain ranges of motion. I was compensating for it, and it was something that I honestly thought was going to go away and that I didn't need to seek care for. I had my husband encouraging me to seek care for it, but he said you're probably going to have to do physical therapy. And I thought to myself, what a nightmare. Who's going to watch our child?" Tr. 58. Further, all the issues for which she saw doctors "were more pressing" than her shoulder pain. Tr. 22. She added that when living on an army base, medical "appointments are 20 minutes long, and the physician or the physician's assistant isn't going to address multiple issues at one time. That's not how it works." Tr. 22.

On March 7, 2014, petitioner presented for trouble reading but also reported four months of left shoulder pain possibly from picking up her newborn so frequently. She denied trauma, redness, bruising, or swelling. Her pain was 4 out of 10 on certain motions. Tenderness along her left deltoid with abnormal motion was noted on examination. Pet. Ex. 9 at 248, 251-53. She reported "feeling pain free today." *Id*. at 251. She reported receiving a "Graston"[6] procedure from her husband's friend which had helped.[7] *Id*. She was referred to physical therapy ("PT"). *Id*. at 253.

Petitioner presented for PT evaluation of left shoulder pain on March 18, 2014. She reported onset with turning to the left to pick up her baby five months ago. The pain kept her up at night; rest did not help, and she had less pain when not carrying her son as much. She rated her pain as a 4-5 out of 10 and stated that the pain was aggravated by closing the car door, swimming, and holding the baby in her left arm. Pet. Ex. 9 at 245. A friend did a maneuver that helped with the pain. *Id*. at 246.

Petitioner attended three more PT sessions through April 4, 2014 and reported that her pain had been reduced to a 2 out of 10. Pet. Ex. 9 at 230-42.

At the onset hearing, petitioner's husband testified that his practice includes treating shoulder injuries, but he had never heard of SIRVA until he attended a Vaccine Leaders Course in Okinawa on March 12-14, 2014. Pet. Ex. 16 at 3, 5; Tr. 101. After speaking with the presenter, who worked with the Armed Forces Immunization Healthcare Center in Virginia, he encouraged his wife to call the presenter. Pet. Ex. 16. at 3; Tr. 102-03.

---

[5] A punch biopsy was requested on October 29, 2013, Pet. Ex. 9 at 277-78; a lesion and biopsy on January 3, 2014, Pet. Ex. 9 at 271; a referral for a lump on her finger. Pet. Ex. 9 at 271-73; dyspareunia on January 8, 2014, Pet. Ex. 9 at 267-69; ulcerative proctitis on January 16, 2014, Pet. Ex. 9 at 265; removal of the lump on her finger on January 17, 2014, Pet. Ex. 9 at 260-61; results of her biopsy of the lump of her finger on January 29, 2014, Pet. Ex. 9 at 257-58; dyspareunia on January 30, 2014, Pet. Ex. 254-56. There were no complaints of shoulder pain at any visit.

[6] During his testimony, Dr. McFadden explained the Graston procedure as soft tissue mobilization. Stainless steel bars are used to scrape the soft tissue and release the muscle tension that causes pain. Tr. 100.

[7] No records related to this procedure were filed.

3

Petitioner contacted the Vaccine Health Center Clinic in Virginia on April 4, 2014 and reported arm pain after a flu vaccine received on October 5, 2013.[8] During the conversation, she reported that the "vaccinator was standing up and she was seated when the shot was injected" and telling her husband "it hurt a lot". Pet. Ex. 9 at 229. She recalled pain about five days later, which has continued until the present with certain movements. *Id.* A record made from that communication includes "Arthralgia – Shoulder Region Left. May be due to Influenza Injection given high in the deltoid area near bursa. Will see and examine patient when she comes to NoVa[9] area in latter part of April '14." *Id.*

Petitioner and her family traveled to Virginia, and on April 30, 2014, she presented to Dr. Montgomery at the Vaccine Health Center Clinic in Fort Belvoir Community Hospital in Fort Belvoir, Virginia. Pet. Ex. 3 at 1. She reported left shoulder pain for seven months with no involvement in strenuous activity beyond carrying her newborn son. Her onset was about 24 hours after receiving a flu shot in October. The injection was given high and anterior on her deltoid. She had no redness, bruising or swelling of the area. The pain peaked within about 5 days and waxed and waned with activity. She tried Motrin and PT without significant or long-lasting relief. She described the pain as localized high on her deltoid and it would radiate mid-way down her lateral upper arm. She denied weakness, distal paresthesia, or loss of range of motion. Most of her discomfort was with internal rotation/adduction of her arm. *Id.* There was no deformity of the acromioclavicular joint or atrophy of the supraspinatus or infraspinatus muscles; there was isolated tenderness to palpation of the anterior superior left deltoid. There was no tenderness of the acromioclavicular joint or subacromial tenderness and no palpable trigger points around the shoulder. There was no loss of active and passive ranges of motion. The Apley scratch test, Hawkins' test, empty can supraspinatus test, and cross-body adduction test were all negative. Yergason's test for biceps tendonitis and internal rotation was positive, producing pain in her upper arm. Axial-loading of the cervical spine did not produce pain. The assessment was arthralgia of the left shoulder. Pet. Ex. 3 at 1; Pet. Ex. 9 at 226-27. Dr. Montgomery opined: "In the absence of other etiology, and given the vaccination technique, SIRVA is a likely diagnosis." Pet. Ex. 3 at 1-2; Pet. Ex. 9 at 227.

An MRI conducted on May 2, 2014 at Fort Belvoir revealed no joint effusion, intact cartilage without defect, unremarkable labrum without tear, mild tendinopathy[10] of the rotator cuff tendon with no evidence of tear, and mild muscle edema. Pet. Ex. 4 at 1-2; Pet. Ex. 10 at 2-3. The impression was small intrinsic tear/strain to the very distal muscle fibers of the subscapularis. The tendon itself was unremarkable through the insertion. Pet. Ex. 4 at 2; Pet. Ex. 10 at 3; Pet. Ex. 9 at 223. Petitioner was advised of the results and given instructions for her return to Okinawa. Pet. Ex. 9 at 222-23.

Petitioner presented to Fort Belvoir for follow-up on May 9, 2014 for left shoulder injury occurring "after a vaccine injection." Pet. Ex. 9 at 217.

---

[8] Her vaccine was received on September 28, 2013. *See* Pet. Ex. 1 at 1. This is noted in the record from the call to the Vaccine Health center. Pet. Ex. 9 at 229.

[9] NoVa is an abbreviation for Northern Virginia.

[10] Tendinopathy is any pathologic condition of a tendon. *Dorland's Illustrated Medical Dictionary* 1852 (33rd ed. 2019) [hereinafter "Dorland's"].

Upon her return to Okinawa, petitioner presented to her primary care physician on July 7, 2014, requesting refills for her asthma and allergy medications. Pet. Ex. 8 at 1. She also reported pain in her left shoulder with movement and 30 minutes of moderate exercise most days. Pet. Ex. 8 at 1, 3.

Petitioner presented for PT on July 29, 2014 and reported avoiding activities that involve her left shoulder. She rated her current pain as 3 out of 10 but a 6 out of 10 at its worst. Pet. Ex. 9. at 208. Petitioner reported pain of 3 to 4 out of 10 and 0 to 1 out of 10 at PT on August 4, 2014 and August 7, 2014, respectively. *Id.* at 205, 203. She had additional sessions on August 11 and August 13, 2014, and by August 18, 2014, petitioner reported improvement, stating that she had been swimming a little. *Id.* at 197. By August 28, 2014, she reported swimming twice a week. Her pain would increase when holding her son. *Id.* at 192. On September 15, 2014, at her tenth PT session, she reported "doing better" and swimming freestyle with no pain. She rated her pain at zero out of 10. All PT goals were as met, and she was discharged. *Id.* at 182-83.

There were no medical records filed for any medical treatment of complaint for the next 14 months, until November 6, 2015, when petitioner presented only for an annual flu vaccine. Pet. Ex. 9 at 135. There were no medical records filed for the next eight months, until petitioner presented for a physical and reported engaging in 150 minutes of moderate intensity exercise per week and muscle strengthening activities two or more days a week. There were no shoulder or arm complaints. Pet. Ex. 9 at 114. Thereafter, no medical records were filed for the period between that visit on July 22, 2016 and June 12, 2020, four years later.

On October 19, 2021, petitioner filed two documents, both titled "Memorandum for Record." Pet. Ex. 24; Pet. Ex. 25. The first, dated October 7, 2021, was authored by Dr. Grumbo, and contained the following:

> From April 2014-July 2018, I was credentialed to work at Madigan Army Medical Center in Tacoma, WA. [Petitioner] was being treated for ongoing left shoulder pain at the 1st Special Forces Group (A) physical therapy clinic. When indicated, I would often assist the clinic with ultrasound guided steroid injections. In reviewing my personal documentation, I can confirm that I performed an ultrasound guided steroid injection on Mrs. McFadden in March 2018.

Pet. Ex. 24. The personal documentation Dr. Grumbo referred to reviewing was not filed.

The second document filed on October 19, 2021 was signed by Anja Rapp, a physical therapist at 1st Special Forces Group Physical Therapy Clinic. Pet. Ex. 25. The record states, "[Petitioner] was treated in the 1st Special Forces Group Physical Therapy Clinic from 2018-2019 for chronic left shoulder pain, hypomobility and abnormal glenohumeral/scapulothoracic movement patterns resulting from chronic compensation and pain. She underwent extensive therapeutic strengthening regimes, mobility training, movement pattern re-education, postural education and pain management techniques." No supporting medical records were filed related to this treatment. Pet. Ex. 25.

The next treatment record was a telehealth visit on June 12, 2020 with Dr. Benjamin Chi at the Fort Belvoir Community Hospital Orthopedic Sports Clinic. Pet. Ex. 23 at 4-5. The history of present illness ("HPI") included "Mechanism of injury how did the patient hurt him/herself – Chronic overuse, with upper body exercise," and "Date of Injury or onset of symptoms – symptoms began in 2014, has been in remission, but recently increased with recent exercises." Pet. Ex. 23 at 4. Her frequency of current pain was noted as "constant" and the injections section noted "subacromial CS injection x1, 2 years prior, 100% relief." *Id*. Dr. Chi wrote, "[s]ymptoms appear to be related to cuff pathology/tendinosis."[11] An MRI and radiography of the left shoulder were ordered. *Id*. at 5.

An MRI of the left shoulder conducted on June 25, 2020 revealed mild subscapularis[12] calcific tendinopathy with no other significant abnormality seen. Pet. Ex. 23 at 1, 8-9. Radiography on the same date revealed a "small punctate hyperdensity in the region of greater tuberosity[13] [which] could represent a focus of subscapularis calcific tendinopathy. Otherwise, unremarkable left shoulder." *Id*. at 2.

Petitioner presented for follow-up with Dr. Chi on July 10, 2020. Pet. Ex. 23 at 6-10. A glenohumeral injection was recommended "to address SLAP[14] pathology along with SubS tendinitis." *Id*. at 9. Petitioner received the recommended injection and was referred to PT. *Id*.

Petitioner presented for PT on July 30, 2020, and the following was documented:

> Patient states she injured her shoulder in 2013 by SIRVA and re-aggravated her symptoms in 2016 when carrying heavy weights on her shoulders when moving. She states prior to an injection 4-5 weeks ago she had 8-10/10 left shoulder pain and was unable to lift her arm to shoulder height. She states she has pain running, swimming, completing weighted workouts at home and the pain has been unbearable. Initially in 2013 she was diagnosed with a supraspinatus tear and the SLAP tear is new as of new MRI in 2020.

Pet. Ex. 20 at 1. She rated her pain a 2 out of 10. *Id*. at 1-2. On August 6, 2020, petitioner reported that she felt the cortisone injection was "wearing off" based on the pain she was feeling while sleeping. *Id*. at 5. On August 13, 2020, petitioner reported being "able to sleep better without or with less shoulder pain depending on the night" and hiking over 12 miles last weekend while holding her 2.5-year-old. *Id*. at 7. On August 20, 2020, she reported that she "swam in a lap pool Sunday (free style and breast stroke) with soreness and fatigue in her shoulder for the past few days. Overall she feels the cortisone injection is 'wearing off' however she feels she is also getting stronger." *Id*. at 10. She also had PT sessions on September 3, 2020 and September 16, 2020. *Id*. at 12, 16.

---

[11] Tendinosis is another term for tendinopathy. *Dorland's* 1852; *supra* n.10.

[12] The subscapularis is the muscle that rotates the humerus medially. *Dorland's* 1194.

[13] Greater tuberosity refers to the greater tubercle of the humerus: "a large flattened prominence at the proximate end of the lateral surface of the humerus, just lateral to the highest part of the anatomical neck, giving attachment to the supraspinatus, the infraspinatus, and the teres minor muscles." *Dorland's* 1952, 1951.

[14] SLAP stands for superior labrum anterior and posterior. Medical Abbreviations at 552 (16th ed. 2020).

At a September 23, 2020 visit, she reported "minimal to no pain sleeping however mild pain (dull) while reaching [overhead]" and starting a new workout at home without pain. Pet. Ex. 20 at 17. On September 29, 2020, she reported "intermittent pinching and pain when sleeping with arm overhead otherwise 'shoulder feels great.'" *Id.* at 20. She was able to return to full activities without limitations. Pet. Ex. 20 at 20. On October 14, 2020, petitioner reported she hadn't been completing her home exercise program "as much" and had increased pain. *Id.* at 22. She was considering surgery for the SLAP tear. *Id.* Her progress with functional activities and improved active range of motion of the shoulder were noted, and she continued to have pain with overhead activities. *Id.* at 23. On October 21, 2020, petitioner reported "feeling much better overall" and performed all activities of daily living independently. *Id.* at 24. Petitioner's last PT visit was on October 28, 2020. *Id.* at 28.

The last record filed is a visit with Dr. Shawn Gee at the Fort Belvoir Community Hospital Orthopedic Clinic on April 20, 2021 for a follow-up evaluation of left shoulder pain. Pet. Ex. 21. The history included shoulder pain beginning in 2013 after a flu shot and 10 PT visits in 2013[15] with some relief of pain. *Id.* at 1. A steroid injection received in 2018 gave her "excellent relief of pain" until 2020, when "she began having more pain while working out." *Id.* Dr. Gee's assessment was "left shoulder pain, provoked by overhead activity, with findings of subacromial impingement on physical exam. Subscapularis tendinopathy and subcoracoid impingement not symptomatic on exam today." *Id.* at 3. Dr. Gee discussed diagnostic surgical arthroscopy with subacromial decompression with petitioner but stated that, though it is an option, the results will be "less reliable" based on her history. *Id.* Petitioner reported that she had been diagnosed with a SLAP tear, but Dr. Gee noted "this is not symptomatic today and isn't clearly discernable on MRI." *Id.* Radiographs of the left shoulder taken that day showed "no radiographically defined left shoulder osseous abnormality." Pet. Ex. 22.

## III. Parties' Arguments

### A. Petitioner's Submission

Petitioner argues that she should receive "no less than $170,000.00 or such higher amount as the Special Master deems appropriate under her particular circumstances, for past pain and suffering" and leaves to the discretion of the Special Master "whether a small award for future pain and suffering is appropriate." Petitioner's Memorandum ("Pet. Memo") at 6.

In support of her demand, petitioner cites to five damage award cases that she asserts are applicable: *Smallwood*,[16] *Ramos*,[17] *Rayborn*,[18] *Dagen*,[19] and *Tjaden*.[20] Pet. Memo at 2. Petitioner claims that these cases contextualize her claim, suggesting if the total award in each of these

---

[15] The medical records indicate that petitioner first presented for PT evaluation on March 18, 2014. *See* Pet. Ex. 9 at 245.

[16] *Smallwood v. Sec'y of Health & Human Servs.*, No. 18-0291V, 2020 WL 2954958 (Fed. Cl. Spec. Mstr. Apr. 29, 2020).

[17] *Ramos v. Sec'y of Health & Human Servs.*, No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021).

[18] *Rayborn v. Sec'y of Health & Human Servs.*, No. 18-0226V, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. Aug. 14, 2020).

[19] *Dagen v. Sec'y of Health & Human Servs.*, No. 18-0442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019).

[20] *Tjaden v. Sec'y of Health & Human Servs.*, No. 19-0419V, 2021 WL 837953 (Fed. Cl. Spec. Mstr. Jan. 25, 2021).

cases is divided by the number of reported months of pain and suffering alleged in each case, the average monthly award is approximately $5,200.00. Petitioner alleges she suffered 85 months of "virtually continuous pain and suffering of various levels, with uninterrupted limitations of ability to perform ordinary daily activities as well as recreational ones." *Id.*

Petitioner explains that Chief Special Master Corcoran's decision in *Smallwood* provides for a mean award of $95,000.00 in cases resolved by government proffer with a range for below-median pain and suffering awards of $60,000.00 to $90,000.00, and a range for above-median pain and suffering awards of $110,000.00 to $160,000.00. Pet. Memo at 3. Petitioner argues that she belongs in the high end of the above-median range of $110,000.00 to $160,000.00, which was characterized by a "good prognosis" but with longer duration of pain or the need for surgical repair. *Id*. at 3, 5.

Petitioner contends that her pain began at the end of September 2013 and continued uninterrupted though waxing and waning for an "unprecedented seven plus years." Pet. Memo at 4. Her pain began almost immediately after receiving her vaccine, worsening over the next five days. When she presented for formal physical therapy six months later, her pain was a level 4 out of 10. *Id*. In 2016, she "re-aggravated her left shoulder and found therapy to be of limited utility thereafter until 2020." *Id*. Petitioner contends that she had ongoing therapy in 2018 and 2019, including a steroid injection in March 2018, and "[t]here is no indication that these later rounds of treatment were the result of any subsequent independent injury." *Id*.

Petitioner claims she was a competitive swimmer and triathlete but now can only swim freestyle "relatively pain free." She is unable to sleep on her left side, has limited range of motion, and is "hampered" in numerous daily activities. Pet. Memo at 4. Her pain level was an 8 out of 10 in June 2020 that decreased to between 2 and 4 out of 10 following a cortisone injection, but her pain remains at a median of 4. *Id*. at 5. Further, petitioner claims that if continued therapy does not provide permanent relief, "it would seem based on a recent surgical consult that at least an exploratory arthroscopy with subacromial decompression is likely." *Id*.

Petitioner makes no specific request for future pain and suffering but submits "given the possible need for surgery as the only possible end to her suffering and given her 2020 treatments . . . this Petitioner would appear to have a reasonable basis for claiming some amount for future pain and suffering" based on the awards in *Smallwood* and in three subsequent cases where some future pain and suffering was awarded. Pet. Memo at 4. However, she concludes that it is entirely at the Special Master's discretion whether a "small award" of future pain and suffering is appropriate. *Id*. at 6.

In a supplemental memorandum submitted following respondent's filing, petitioner provides the five criteria set forth in SIRVA damages decisions, arguing that the length and amount of treatment and the impact on the injured person are the "more reliable criteria." Petitioner's Supplemental Memorandum ("Pet. Supp. Memo") at 2, ECF No. 82. Petitioner argues that when there is an award for pain and suffering, the length of time that has elapsed with pain and a loss of ability to perform as one did prior to vaccination is the most significant measure, and based on that, petitioner has suffered "far and away longer" than those in the comparison cases she provides. *Id*.

### B. Respondent's Submission

Respondent proposes an award of $62,500.00 for petitioner's pain and suffering. Respondent's Memorandum ("Resp. Memo") at 1, ECF No. 81. Respondent cites *Rayborn* and *Knauss* as comparative cases for evaluating petitioner's pain and suffering claim. *Rayborn v. Sec'y of Health & Human Servs*., No. 18-0226V, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. Aug. 14, 2020); *Knauss v. Sec'y of Health & Human Servs*., No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018). In *Rayborn*, petitioner did not seek medical attention for four months after vaccination, had an MRI, received a cortisone injection, and eight months of occupational therapy. She was awarded $55,000.00 for pain and suffering. Resp. Memo. at 7. In *Knauss*, petitioner did not seek care for 84 days following vaccination. His treatment included a cortisone injection and physical therapy that lasted a little more than a year. He was awarded $60,000.00 for pain and suffering. *Id*. at 8. Respondent pointed out that petitioner's course of treatment spanned a greater time period, but there were "significant gaps" during that time period. *Id*.

Further, respondent argued that an award for future pain and suffering is not appropriate based on "petitioner's conservative treatment, large gaps in treatment over several years, and the fact that her claimed ongoing shoulder pain may be exercise induced or otherwise unrelated to her SIRVA injury." Resp. Memo at 8.

## IV. Legal Standard for Damages

Compensation awarded via the Vaccine Act shall include "actual and projected pain and suffering and emotional distress from the vaccine-related injury…not to exceed $250,000." § 15(a)(4). The petitioner bears the burden of proof for each of element of compensation requested. *Brewer v. Sec'y of Health & Human Servs*., No. 93-0092V, 1996 WL 147722, at *22 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

Pain and suffering and emotional damages are "inherently subjective" and cannot be calculated mathematically. *I.D. v. Sec'y of Health & Human Servs*., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013). In determining an award of pain and suffering, special masters should consider the awareness of the injury, severity of the injury, and duration of the suffering. *Id*.; *McAllister v. Sec'y of Health & Human Servs*., No. 91-1037V, 1993 WL 777030, at *3 (Fed Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995).

In the past, special masters determined pain and suffering on a continuum, where only the most severely injured received the full $250,000 amount available for pain and suffering. *See*, *e.g*., *Hocraffer v. Sec'y of Health & Human Servs*., No. 99-533V, 2007 WL 914914, at *5-6 (Fed. Cl. Spec. Mstr. Feb. 28, 2007) (discussing the development of the "continuum of injury" for awards of pain and suffering). This approach was explicitly rejected by the Court of Federal Claims in 2013. In *Graves v. Sec'y of Health & Human Servs*., Judge Merow stated that this approach forced "all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." 109 Fed. Cl. 579, 589-90 (2013). Instead, pain and suffering damages should be assessed independently of

the $250,000 statutory limit, after which the cap is "applied." *Id*. at 587-88. Judge Merow determined the appropriate award of pain and suffering damages using the three *McAllister* factors and looking to prior pain and suffering awards made in both Vaccine Program cases and comparable injury cases outside of the Vaccine Program. *Id*. at *589-91. Similarly, a special master may look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering. *Jane Doe 34 v. Sec'y of Health & Human Servs*., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case.").

## V.   Analysis

### A.  Appropriate Compensation in this SIRVA Case

#### 1.      Awareness of Suffering

In this case, awareness of the injury is not in dispute. The record reflects that at all times petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, the undersigned's analysis will focus principally on the severity and duration of petitioner's injury based on the evidence filed.

#### 2.      Duration and Severity of Pain and Suffering

Petitioner argues that she suffered 85 months of "virtually continuous pain and suffering of various levels, with uninterrupted limitations of ability to perform ordinary daily activities as well as recreational ones." Pet. Memo at 2. She contends that *Smallwood*,[21] *Ramos*,[22] *Rayborn*,[23] *Dagen*,[24] and *Tjaden*[25] contextualize her claim, suggesting if the total award in each of these cases is divided by the number of reported months of pain and suffering alleged in each case, the average monthly award is approximately $5,200.00. *Id*.

Petitioner's medical records do not support 85 months of "continuous pain and suffering of various levels, with uninterrupted limitations of ability to perform ordinary daily activities as well as recreational ones." Pet. Memo at 2. At various times, petitioner reported to her medical providers that she was pain free[26], feeling great[27], and engaging in moderately intensive activities including swimming[28], running[29], hiking[30], and exercising.[31] The evidence filed in this case

---

[21] *Smallwood*, No. 18-0291V, 2020 WL 2954958.
[22] *Ramos*, No. 18-1005V, 2021 WL 688576.
[23] *Rayborn*, No. 18-0226V, 2020 WL 5522948.
[24] *Dagen*, No. 18-0442V, 2019 WL 7187335.
[25] *Tjaden*, No. 19-0419V, 2021 WL 837953.
[26] Pet. Ex. 9 at 251.
[27] Pet. Ex. 20 at 20.
[28] Pet. Ex. 9 at 192, 182-83; Pet. Ex. 20 at 1, 10.
[29] Pet. Ex. 20 at 1.
[30] Pet. Ex. 20 at 7.
[31] Pet. Ex. 9 at 114; Pet. Ex. 20 at 1, 17.

demonstrates long periods of time without any medical intervention, treatment, complaints, or inability to participate in her usual daily activities.

Petitioner first presented for treatment for left shoulder pain on March 7, 2014, six months after flu vaccine. As discussed above, petitioner sought treatment during that six-month period for other issues that she deemed more pressing. *See* Ruling on Onset at 16-18, ECF No. 60. She further provided that during those six months "it just wasn't something that–you know, it was a complaint that I had with certain ranges of motion. I was compensating for it, and it was something that I honestly thought was going to go away…" Tr. 58. When petitioner presented for the first time for her shoulder, she reported "feeling pain free" after a Graston procedure performed by a family friend. Pet. Ex. 9 at 251-53. No record of this procedure was filed.

Petitioner attended four PT appointments between March 18, 2014 and April 4, 2014. Pet. Ex. 9 at 230-42, 245-46. Her therapeutic goals included being able to hold her baby in her left arm, close the car door, and turn behind to use her left arm. *Id*. She rated her pain at a zero out of 10 on March 25; a 6 out of 10 on March 27; and a 2 out of 10 on March 31. *Id*. at 230, 237, 240.

Petitioner then presented to Dr. Montgomery in Virginia on April 30, 2014. Pet. Ex. 3 at 1. Examination revealed no loss of active or passive range of motion, but the Yergason's test for biceps tendonitis was positive and internal rotation produced pain in her upper arm. The assessment was arthralgia of the left shoulder and Dr. Montgomery noted that "SIRVA is a likely diagnosis." Pet. Ex. 3 at 1-2; Pet. Ex. 9 at 226-27. An MRI performed on May 2, 2014 showed no joint effusion, intact cartilage without defect, unremarkable labrum without tear, mild tendinopathy of the rotator cuff tendon with no evidence of tear, and mild muscle edema. The impression was a small intrinsic tear/strain of the subscapularis. Pet. Ex. 4 at 1.

Between July 29, 2014 and September 15, 2014, petitioner returned for ten more PT treatments in Okinawa. Pet. Ex. 9 at 190-209. Her reported pain ranging between zero to 5 out of 10 during these sessions. *Id*. Upon discharge, she rated her pain at a zero out of 10, reporting she was "doing better" and swimming freestyle with no pain. Pet. Ex. 9 at 181-84.

For over five years, between September 15, 2014 and June 12, 2020, the only records filed were an annual flu shot on November 6, 2015 and a physical on July 22, 2016 at which petitioner reported engaging in 150 minutes of moderate intensity exercise per week and muscle strengthening activities two or more days a week. Pet. Ex. 9 at 135, 114.

Following settlement negotiations that failed, the parties decided it was necessary for the Court to determine damages and submissions on damages were ordered. Petitioner then filed Exhibits 24 and 25 on October 19, 2021. ECF No. 79. The exhibits, memoranda from Dr. Robert Grumbo and Physical Therapist Anja Rapp, reported that petitioner received a steroid injection in March 2018 and physical therapy at the 1st Special Forces Group Physical Therapy Clinic in 2018 and 2019. Pet. Ex. 24; Pet. Ex. 25. No records of these treatments were filed.

Without treatment records from the 1st Special Forces Group Physical Therapy Clinic, it is unknown when this treatment took place during 2018 and 2019, what complaints petitioner

presented with, what activities she was engaged in, how often petitioner was treated, what her treatment consisted of, what she reported had transpired in the three-and-a-half-year period since her last visit to any medical provider for her shoulder in September 2014, and what her condition was when she completed this PT in 2018 and 2019.[32]

Petitioner's next presentation to a medical provider was to Dr. Chi at Fort Belvoir Community Hospital Orthopedic Sports clinic on June 12, 2020. The record documented a history of onset in 2014, remission, and an increase in pain from recent exercises, the mechanism of injury as "…chronic overuse, upper body exercise", and the receipt of a subacromial injection two years prior with 100% relief.[33] Pet. Ex. 23 at 4-5. There was no mention by petitioner of any PT two years prior and/or in 2018/2019, only of the receipt of the subacromial injection.

An MRI on June 25, 2020 revealed mild subscapularis calcific tendinopathy with no other significant abnormality. Pet. Ex. 23 at 1, 8-9. Radiography of the left shoulder showed a "small punctate hyperdensity in the region of greater tuberosity [which] could represent a focus of subscapularis calcific tendinopathy. Otherwise, unremarkable left shoulder." *Id*. at 2.

At a follow-up on July 10, 2020, Dr. Chi performed a glenohumeral injection "to address SLAP pathology along with SubS tendinitis", and petitioner was referred to PT.[34] Pet. Ex. 23 at 9-10.

When she presented for PT on July 30, 2020, she reported a SIRVA in 2013 that was re-aggravated in 2016 when carrying heavy weights on her shoulders while moving, an injection 4-5 weeks ago, and currently unbearable pain while running, swimming, and weight training. Pet. Ex. 20 at 1. Petitioner further reported she was diagnosed with supraspinatus tear in 2013; the SLAP tear on the 2020 MRI was new. *Id.*

Petitioner attended 11 sessions of PT, approximately once per week from July 30, 2020 until October 28, 2020. She reported swimming freestyle and breaststroke with some soreness and intermittent pinching and pain when sleeping with her arm overhead, but otherwise her "shoulder feels great", she was back to full activities without limitation, and was "feeling better overall." Pet. Ex. 20 at 5, 7, 10, 20, 24, 28.

Six months later, petitioner presented to Dr. Gee reporting a history of shoulder pain beginning in 2013 after a flu shot, 10 PT visits in 2013 with some relief of pain, and a steroid injection in 2018 with "excellent relief of pain" until 2020, when "she began having more pain while working out." Pet. Ex. 21 at 1. Dr. Gee's assessment was "left shoulder pain, provoked by overhead activity, with findings of subacromial impingement on physical exam. Subscapularis tendinopathy and subcoracoid impingement not symptomatic on exam today." *Id*. at 3. There was

---

[32] Based on petitioner's documented attendance at PT, she presented for four sessions over one month, ten sessions over 1.5 months, and 11 sessions over three months, respectively. Without treatment records, one can only speculate on the frequency and length of time during 2018 and 2019 that petitioner attended PT.

[33] This presumably refers to the March 2018 injection performed by Dr. Grumbo. *See* Pet. Ex. 24.

[34] Petitioner's 2014 MRI showed mild muscle edema and a "small intrinsic tear/strain" to the subscapularis. The labrum was unremarkable and without tear and the rotator cuff showed no evidence of tear. Pet. Ex. 4.

no mention by petitioner of any PT in 2018/2019, only an injection in 2018 with excellent relief until 2020.

The history petitioner reported to her medical providers and the assessments of her left shoulder in 2020 and 2021 are telling. She reported to Dr. Chi on June 12, 2020 an onset of symptoms in 2014 (sic), remission, an injection two years prior (2018) with 100% relief, and a recent increase in pain assessed to be the result of a chronic overuse injury from upper body exercise. Pet. Ex. 23 at 4-5. She mentioned nothing about PT in 2018 and/or 2019.

At her first PT session on July 30, 2020, petitioner reported a history of left shoulder injury in 2013, re-aggravation in 2016 when carrying heavy weights on her shoulders while moving, an injection 4-5 weeks ago, and current pain while running, swimming, and weight training. She further reported the "SLAP" injury on her recent MRI was new. Pet. Ex. 23 at 1-2, 8-9; Pet. Ex. 20 at 1. She failed to mention the 2018 injection or any PT in 2018 and/or 2019.

Petitioner then presented to Dr. Gee on April 20, 2021, reporting shoulder pain in 2013 after a flu shot, 10 PT visits in 2013 with some relief of pain, and a steroid injection in 2018 with "excellent relief of pain" until 2020 when "she began having more pain while working out." Pet. Ex. 21 at 1. There was no mention of any PT in 2018 and/or 2019.

Succinctly, petitioner's own reported medical history to her providers includes long blocks of time with little to no issues with her left shoulder. She consistently reported left shoulder injury in 2013 following a flu vaccine. At her first medical appointment for her left shoulder six months later she was "pain free" due to a Graston procedure performed by a friend. Pet. Ex. 9 at 251-53. She attended PT sessions in 2014, and her pain improved from a range of 3 to 8 out of 10 at her initial presentation in April 2014 to a zero out of 10 on discharge in September 2014. *Id.* at 245, 183. Her ability to hold her baby and close a car door improved from a 5/6 out of 10 to a 9 out of 10, and she was able to swim freestyle without pain at that time. *Id.* at 182-83. At one medical visit, she reported a recurrence of pain in 2016 but no records were filed to support that. Pet. Ex. 20 at 1. She reported a steroid injection in 2018 with "excellent relief of pain." In 2020, she returned for treatment after developing left shoulder pain while working. At that time, she was deemed to have a chronic overuse injury and an MRI showed a new SLAP injury, so she received another steroid injection, attended 11 PT sessions, and was able to return to full activity without limitations. Pet. Ex. 23 at 1, 4-5, 8-9; Pet. Ex. 20. Petitioner's record supports an active lifestyle which includes swimming, running, hiking, weightlifting, and caring for her family and her home.

Giving full consideration to the contemporaneous medical records filed and petitioner's own history to her medical providers between 2013 and 2021, there were long periods of time in which she did not pursue any medical treatment for her left shoulder, including September 15, 2014 to March 2018 (42 months) and March 2018 to June 22, 2020 (26 months). These gaps amount to about 68 months during which petitioner provided no evidence of any complaints, treatment, or inability to attend to her regular daily activities due to left shoulder pain. Even accepting Physical Therapist Rapp's memorandum that petitioner received PT in 2018 and/or 2019 for a host of complaints, there were no records filed to know what prompted her return for treatment, when she presented for treatment, what complaints *she* reported, what treatment she

received, how many treatments she received, what her condition was upon discharge, or when she was discharged from treatment. Based on her prior history of attending PT, her longest course of PT was 11 sessions over a three-month period. Using that as a guide, of the 85 months that petitioner submits for pain and suffering, approximately 65 months have no support in the record for continuous pain and debility as claimed. Thus, the evidence filed supports only 17-20 months of treatment, pain, suffering, and inability to engage in her normal activities of daily living.

Petitioner argues that she belongs on the high end of above-median pain and suffering awards, in the range from $110,000.00 to $160,000.00. Pet. Memo at 5, 3. Petitioner's medical course does not align with cases in that range. Further, the comparison cases she cited to include awards significantly lower than her request for compensation, and she provides little to no explanation as to what is distinguishable about her case to justify the award she requests. *See* Pet. Memo, Ex. C. Of the cases cited by the parties, the *Knauss* case bears the most factual similarities to petitioner's circumstances. Resp. Memo at 8; *Knauss v. Sec'y of Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018). Mr. Knauss had a delay in seeking treatment, albeit less extensive than petitioner's, and had notable gaps in his treatment thereafter. His course of treatment was approximately one year; he attended a total of 24 PT sessions, had two MRIs, and received one cortisone injection. *Id*. at *3, *7. Mr. Knauss was awarded $60,000.00 for his pain and suffering. Petitioner received 2 steroid injections. She attended a total of 25 documented PT sessions between 2014 and 2020. She had two MRIs, with the second in 2020 revealing a new injury. Surgery was discussed seven years after vaccination in the context of an overuse injury and for exploratory purposes and decompression, with Dr. Gee recommending against it and suggesting that there would be no real benefit based on the history she reported. Pet. Ex. 21 at 3. While petitioner's submission of pain and debility spans an 85-month period from the time she received the subject vaccination and the submission of her memorandum of damages, there are significant gaps of time in her records without evidence of the ongoing pain or debility she claims and/or the need for medical treatment. The records do support that petitioner seeks treatment when she has pain and when that pain interferes with her activities.

It is notable that petitioner received the causal vaccine just a few days after the birth of her son. *See* Ruling on Onset, ECF No. 60. Petitioner having suffered a vaccine-related shoulder injury while caring for a newborn and infant adds value to her claim. *See Heewon Kim v. Sec'y of Health & Human Servs.*, No. 17-418V, 2018 WL 3991022 at *8 (Fed. Cl. Spec. Mstr. July 20, 2018); *Desrosiers v. Sec'y of Health & Human Servs.*, No. 16-0224V, 2017 WL 5507804 at *5 (Fed. Cl. Spec. Mstr. Sept. 19, 2017).

Therefore, after a careful and comprehensive review of the facts of this case and a consideration of the arguments presented by both parties and the case law, I find that **$75,000.00** in compensation for past pain and suffering is reasonable in this case.

### 3.   Future Pain and Suffering

Finally, petitioner states that she is "arguably entitled to compensation for foreseeable pain and suffering" based on the "possible need for surgery as the only possible end to her

suffering and given her 2020 treatments, seven years after the original injury." Pet. Memo at 3 n.1, 4 n.2. As discussed thoroughly above, petitioner had significant gaps of time in her treatment, injuries attributable to chronic overuse from her lifestyle, and daily activities, and years where there were no complaints of or treatment for her 2013 vaccine-related injury. Petitioner's medical records do not support constant or continuous pain, and while Dr. Gee discussed a shoulder arthroscopy, he also noted that her SLAP tear which was new and was not symptomatic at the time of her most recent treatment nor "clearly discernible" on her most recent MRI. Pet. Ex. 21 at 3. Therefore, I do not find that an award of future pain and suffering is appropriate in this case.

## VI. Conclusion

For the reasons discussed above and based on consideration of the record as a whole, the undersigned awards:

> **A lump sum payment of $75,000.00,** representing compensation for petitioner's actual pain and suffering, **in the form of check payable to petitioner, Megan C. McFadden.**

The Clerk of Court is directed to enter judgment in accordance with this decision.[35]

**IT IS SO ORDERED.**

**s/Mindy Michaels Roth**
Mindy Michaels Roth
Special Master

---

[35] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing a notice renouncing the right to seek review.